[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 382 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 384 
The surrogate found in this case that the voluntary association, now represented by the appellants, was the legatee to whom the bequest in the will of Owens was intended to be made; and the supreme court appears to have arrived at the same conclusion. The only question before this court, therefore, is, whether a bequest to such an association is valid. This question is not affected by the incorporation of the missionary society after the making of the will, and after the death of the testator. (Baptist Association v. Hart's Executors, 4Wheat., 1; Same v. Smith Robertson, 3 Peters, inAppendix, 481; Trustees of Sailors' Snug Harbor, 3 Peters,
99.) In view of these authorities it is clear that, for all the purposes of this case, the question is precisely the same as if the appellants had remained unincorporated to the present time; and so it seems to have been regarded by the counsel as well as by the court below.
If the bequest to the association while unincorporated was valid, there can, I apprehend, be no doubt of the right of the appellants to the legacy. The corporation is simply the association incorporated. The name is the same, and it is to be inferred from the case that the original associates are the corporators. It is the same body, and possesses all its original rights, together with such rights and powers in addition as are conferred by its charter.
For the appellants, two points are made which are directly in conflict. It is insisted: First. That the bequest *Page 385 
to the missionary society is absolute, and not qualified or limited by any trust whatever; and Secondly. That it is valid as a charity. These two positions are inconsistent, and cannot stand together. Nothing is a charity, in a legal sense, except that which is limited to some charitable use. But if this bequest is unaccompanied by any trust, the fund might be appropriated by the association to the establishment of a gaming-house, or any other immoral purpose; or it might be distributed among and be pocketed by the members. An absolute gift or bequest to an unincorporated missionary society is no more "a charity" than an absolute gift to an individual. In legal contemplation, "charity," and "charitable use," are convertible terms; and there can be no charitable use without a trust. To deny that this bequest was accompanied by a trust, therefore, is to deny that the law of charitable uses applies to the case; and this, of course, is to deny the validity of the bequest. Nothing is better settled than that a devise or bequest to an unincorporated association is, in general, void, as well in equity as at law. (Co. Litt., 95, a;Shep. Touch., 235; Jackson v. Corey, 8 John., 385;Hornbeck v. Westbrook, 9 id., 73; Baptist Association v.Hart's Executors, 4 Wheat., 1; Green v. ____ ____ 6Conn., 293.) It is only by virtue of that peculiar jurisdiction exercised by courts of equity, in regard to charitable uses, that such bequests have ever been sustained.
To uphold this bequest, therefore, it is indipensable to maintain that the missionary society, if successful in obtaining the fund in question, would be bound to appropriate it to some pious or charitable use. If, then, a bequest, unaccompanied by any designation of the purposes to which it is to be applied, be made to a society whose name and public acts indicate that its objects are religious or charitable, is there an implied trust which limits the use to such objects? Where the bequest is to a corporation there would seem to be some basis for such an implication, *Page 386 
because the objects, purposes and powers of the corporation being in all cases more or less clearly defined by its charter, the bequest may fairly be presumed to have been intended for those specific objects. But we have no such criterion for ascertaining the nature and purposes of a voluntary association. Those purposes may change with the will of the associates. They may be pious to-day and impious to-morrow. There is no law to prevent or restrain such changes. It is difficult to see, therefore, how a bequest to such an association can be deemed to create a "charitable use," unless the purpose to which it is to be devoted is pointed out by the testator.
It has nevertheless been held, in several cases, that a mere naked bequest to an unincorporated association is valid as a charity. In Hornbeck's Executors v. American Bible Society (2Sandf. Ch. R., 133), a legacy, absolute in terms, to the New-York State Colonization Society, a mere voluntary association, was held valid by Assistant Vice-Chancellor Sandford, under the law of charitable uses; and in the case ofBanks v. Phelan (4 Barb., 80), a legacy to the Roman Catholic Church of Petersburg was sustained by the late Justice Edwards upon similar grounds, although the church was not incorporated, and although there was not a word in the will indicative of the use to which the fund should be applied. So in the case of Executors of Burr v. Smith (7 Verm., 241), the Supreme Court of Vermont, after a very elaborate argument and investigation, held legacies valid as charities which were given to the treasurers of the American Bible Society, the American Colonization Society and the American Home Missionary Society respectively, the societies being unincorporated. The legacies were given in each case, as expressed in the will, "for the use and purposes of the society," and there was no other express limitation of the uses to which the fund was to be applied. *Page 387 
In these cases the courts must have proceeded upon the ground that it was to be presumed that the testator intended the legacy to be used to promote the objects indicated by the names of the societies. In no other way could these bequests have been regarded as "charities," it being essential to a legal charity that there be a use and a trust. Without intending to express any opinion as to the correctness of these cases in this respect, I shall, nevertheless, assume, for the purposes of this case, that when a bequest is made to an unincorporated society, whose general objects are known to be, as its name indicates, religious or charitable, a trust is implied that the fund shall be devoted to those objects. With this assumption can the bequest in this case be supported as a charity?
This question opens up an inquiry which is surrounded with difficulty. The law of charitable uses, as it has existed in England, may be ascertained with reasonable certainty; but how far that law prevails in this state, and to what extent our courts have succeeded to the powers exercised in the English courts of equity on the subject, depends upon considerations which are necessarily obscure.
The jurisdiction of the court of chancery in England in relation to charities was derived from three sources: First. From its ordinary jurisdiction over trusts; Second. From the prerogative of the crown; Third. From the statute of 43Elizabeth, ch. 4. It has never been seriously contended that the courts of this state possessed that portion of the jurisdiction which was derived from the statute of Elizabeth. This statute was embraced in the general repeal of English statutes in 1788, and there is not the slightest evidence that it had previously been adopted so as to become a part of the common law of the state. It is clear, therefore, that so far as the law of charitable uses was derived from and dependent upon the statute of 43 Elizabeth, it is not in force here, and it seems equally clear that our courts are not endowed with any portion of the power which the chancellor *Page 388 
of England exercises by virtue of the royal prerogative, and as the personal representative of the crown. It follows that the jurisdiction possessed by the courts of this state over trusts for charitable purposes is limited to that which the court of chancery in England possessed independent of those two sources. This is the view which seems to have been taken of the subject by this court in the case of Williams v. Williams (4 Seld.,
525).
Were it possible, then, to analyze at this day the jurisdiction of the English courts, and to ascertain the exact proportion of its separate parts, all doubts in regard to the jurisdiction of our own courts would be resolved. But the blending of the powers derived from these various sources in the same court, and their consequent indiscriminate exercise, has rendered this a difficult task. I think, however, that a careful attention to the history of the jurisdiction, and especially that part of it which is based upon the statute of Elizabeth, will enable us to determine with some degree of precision the relative importance of its different branches.
To comprehend this history fully it will be necessary to recur to the origin of uses, and to some of the statutory enactments bearing upon them, "charitable uses" being the legitimate offspring of these enactments. The first invention by which the ecclesiastics of England sought to evade the statutes of mortmain, viz., common recoveries, having been defeated by the statute of Westminster 2, 13 Edward I., ch. 22, which provided that, notwithstanding the defendant made default, it should still "be inquired of by the country whether the demandant had right," the next device was that of uses. As lands could not be conveyed directly to the ecclesiastical bodies themselves, they were procured to be conveyed to others to the use of such bodies, and by the aid of the court of chancery, which held the feoffees bound to execute such uses, the object of the ecclesiastics was accomplished. An attempt was made to meet *Page 389 
this new device by the statute of 15 Richard II., ch. 5. But as this statute was only aimed at corporations and such bodies as had perpetual succession, there were many uses of a superstitious nature which were not within its provisions. It was not, therefore, until the statute of 23 Henry VIII., ch. 10, that this new invention of the clergy met with its final overthrow. That statute provided that all uses, c., to the use of churches, chapels, church wardens, guilds, companies or brotherhoods, made of devotion, or by assent of the people,without any corporation, and also to the intents to have any continual service of a priest for threescore years, or otherlike uses, should be void.
The broad and comprehensive terms of this statute evince the hostility which uses, perverted as they had generally been to superstitious purposes, had excited. Its sweeping phraseology served not only to suppress all superstitious uses, but subverted many which were meritorious. It soon came to be seen that all uses were not superstitious. Accordingly, the statute of 1Edward VI., ch. 14, called the statute of chauntries, speaks in the preamble of "good and godly uses, as in erecting of grammar schools to the education of youth in virtue and godliness, the further augmenting of the universities, and better provision for the poor and needy."
The term "charitable," as descriptive of a particular class of uses, appears to have had its origin subsequent to the latter act, and was used, in contradistinction to superstitious, to designate such good and worthy uses as were deemed not to be within the purview of the statute of Henry VIII. There is no evidence that this term was applied to such uses to distinguish them legally as a class until after the statute of 1 Edward VI. Indeed, there is strong evidence that it was not; otherwise it would certainly have been resorted to in the preamble to that act, instead of the far less appropriate phrase "good and godly." This preamble was clearly the germ of the law of charitable *Page 390 
uses, not that such uses did not exist before, but they had never been grouped together as a distinct class, and no peculiar principles had been applied to them. The words "other like uses," in the statute of 23 Henry VIII., ch. 10, naturally gave rise to this classification. They were suggestive of a class of uses not "like" those intended to be condemned, and the statute of 1Edward VI. was the first attempt at a description of this class. From the date of this statute, if not before, it was strenuously maintained that the statute of 23 Henry VIII. was aimed solely at superstitious uses and that the uses mentioned in the preamble to the statute of 1 Edward VI. were examples of an extensive class of exceptions. The term "charitable" soon came to be used as descriptive of this class. There appears, however, to be no reported case in which this doctrine was distinctly confirmed by the courts, prior to Porter's case (1 Coke, 16,a). This case deserves careful consideration, as throwing much light upon the law of charitable uses. It will be found to harmonize with and to be strikingly confirmatory of the view I have taken of the origin of such uses as a class.
The case was this: Nicholas Gibson, of London, had devised, in the reign of Henry VIII., all his lands and tenements to his wife, upon condition that she should, immediately upon his decease, by the advice of learned counsel, give, grant and assure the same for the maintenance of a free school, and certain alms-men and alms-women forever. The widow, instead of executing the trust, made a lease for forty years, and the defendant, Porter, was in possession under this lease. The heir entered for breach of the condition and then conveyed to the queen, whereupon the attorney-general filed an information in the court of exchequer in behalf of the queen to recover possession. The case was argued by Sir Thomas Egerton, afterwards Lord Ellesmere, and by Sir Edward Coke for the queen. The defendant's counsel insisted that the condition was void under the statute of 23Henry VIII., ch. 10, for the following, *Page 391 
among other reasons: Because "the statute saith `such uses, andall other like uses, intents, c.,' shall be void." To which the counsel for the queen replied, that the case was not within the intent of the act of 23 Henry VIII., "because it was not the intention of the said act to extend to such good andcharitable uses as the uses in our case are;" and again, after referring to various other statutes made to suppress certain superstitious uses, they say: "But by none of these acts goodand charitable (as the uses in our case), are taken away, abolished or made void, but rather by the act of 1 Edward VI. they are intended to be maintained, as appeareth by the preamble thereof, viz., `For the education of youth in virtue and piety at grammar schools, for the further augmentation of the universities and the better provision of the poor and needy,' which, by the said act of 1 Edward VI., are called good and godly uses; and therefore it shall not be intended that such good and godly uses were made void by the statute of 23 Henry VIII." The court held "that the statute of 23 Henry VIII. did not extend to take away the good and charitable uses in the case at bar," and gave judgment for the queen. Lord Coke adds: "And the same day judgment was given in the King's Bench, in the like case upon the said statute of 23 Henry VIII." This case shows that the term "charitable" was used at this time to designate a class of uses excepted from that statute. It will be seen, too, that the learned counsel for the queen base their argument for the exception, not upon any classification of uses as charitable prior to the statute of Henry VIII., but upon the inference to be drawn from the preamble to the statute of 1 Edward VI., ch. 14; and also that they argue it as an original question, and do not even allude to any judicial authority for their position.
It would be difficult, I think, to maintain, in the face of such an argument from two such men as Egerton and Coke, that the law of charitable uses, as it afterwards existed, had obtained at that time any substantial foothold in the law *Page 392 
of England. But this is not all. The reference by Coke, in the conclusion of his report of Porter's case, to a judgment of the court of king's bench, pronounced on "the same day," and in "the like case," is very significant. The case referred to by Coke is that of Martindale v. Martin (Cro. Eliz., 288), more fully reported by Popham under the name of Gibbons v. Maltyard Martin (Poph. R., 6). There, Sir Richard Fulmerston had devised certain lands to his executors, in trust, to be appropriated to the permanent maintenance of a preacher "to preach the word of God in the church of St. Mary, in Thetford, four times in the year, and to have for his labor ten shillings for every sermon," and to the establishment of a free school. The executors neglected the trust, and the heir entered for condition broken, whereupon the lessee of the executors brought ejectment. The first point taken by the defendants was, that the use was made void by the statute of 23 Henry VIII., ch. 10. As to this, Popham says: "But it was, after often argument, agreed by all the court that the first exception was to no purpose, for they conceived that this statute was to be taken to extend only to the uses which tend to superstition," c. Now the fact that the judgment of the king's bench in this, and of the exchequer inPorter's case, were rendered on the same day, and that, too, after repeated argument in the king's bench raises a probability that the decision was the result of an interchange of views between the courts; and this probability is increased by the circumstance that Sir John Popham, who was chief justice of the king's bench at the time the decision was made, was attorney-general when Porter's case was commenced, and himself filed the information in that case.
We have here, then, a combination of the most eminent legal talent in England, including the justices of the king's bench, the barons of the exchequer, the attorney and solicitor-general, repeatedly arguing and gravely considering whether there was at that time any such thing as a valid *Page 393 
charitable use in England, except those enumerated in the preamble to the statute of 1 Edward VI., ch. 14. It was held that there was, and what was the ground? Not that charitable uses were known and recognized as a distinct class, prior to the statute of 23 Henry VIII., but, as stated by Popham, it was that at the time of that statute "they began to have respect to the ruin of the authority of the pope," c. This also is the argument used in Porter's case. The queen's counsel, speaking of the statute of Henry VIII., then say: "Distinguenda sunttempora, and the time when this was made is to be considered. * * * Before that time divers superstitions and errors in the Christian religion, which had a pretence and semblance of charity and devotion, were discovered by the light of God's word; therefore, to take away such superstitious uses, as to pray for souls supposed to be in purgatory, and the like, that statute was made, and not to prohibit the erecting of grammar schools, and relief for poor men."
It is not claimed that these cases prove that there was no such thing as charity in England, previous to the statute of 23 HenryVIII., nor that there were no uses created for charitable purposes, which were upheld and sustained by the courts. But they do prove that such uses had not, prior to that statute, been grouped together as a distinct class, and made the subject of a separate and peculiar jurisdiction. It is clear that this statute gave rise to that grouping, by first rendering it necessary to distinguish between such uses and those which were superstitious. The question to be determined is not, when did charity begin in England, but, what was the origin of that peculiar code administered by the court of chancery under the name of "the law of charitable uses," and I maintain that the two cases here referred to conclusively show that there were no traces of that code in the law at that time.
But we have not yet exhausted the light shed by Porter's case
upon this obscure subject. Lord Loughborough, speaking *Page 394 
of this case in Attorney-General v. Bowyer (3 Ves., 714) says: "Porter's case was upon a devise before the statute of wills, and consequently before the statute 43 Elizabeth. It does not appear that this court, at that period, had cognizance,upon information, for the establishment of charities. Prior to the time of Lord Ellesmere, as far as the tradition in times immediately following goes, there were no such informations as this upon which I am now sitting, but they made out the case as well as they could at law." Porter's case itself affords strong circumstantial evidence of the truth of this remark. That was an instance of a charitable use of the most favored kind, as the law was afterwards understood; and what was the course pursued by the most eminent counsel in England to enforce it? The first step taken was an entry by the heir for condition broken; the next, a conveyance by the heir to the queen; and the third, an information by the attorney-general, not in the court of chancery to establish the use, but in the court of exchequer to recover possession. That all this was done by the advice of Sir John Popham, who was then attorney-general, is evident, because the entry by the heir was on the twenty-fourth of January, the conveyance to the queen on the twenty-fifth, and the filing of the information on the third of February, six days afterwards; and that the object of the whole was to secure the execution of the trust is proved by the subsequent argument in the case. Would Sir John Popham, attorney-general, and one of the ablest lawyers in England, have resorted to this indirect and circuitous mode of establishing the use, if he had supposed it could be done by a direct proceeding in chancery? The information in the exchequer was a proceeding at law in the nature of an ejectment.
The course pursued in this case, as well as that upon the will of Sir Richard Fulmerston, go strongly and almost conclusively to show that informations in chancery by the artorney-general in such cases were not then known; and *Page 395 
this is still further confirmed by the result of the researches of the record commissioners of England, who, as I understand their report, did not discover a single instance of the filing of such information prior to the time of which we are speaking.
There is still another case with which Lord Ellesmere was connected, and which, as it possesses some extraordinary features, is worthy of notice here. It is not found in any volume of reports, but is elaborately reported in the preamble to the statute of 4 James I., ch. 7. Hugh Westwood, of Chedworth, in the county of Gloucester, had devised certain premises, consisting of a rectory, parsonage, advowson, c., to Lord Charedes and a number of other devisees, in trust, to found and maintain a free grammar school in the town of Northleech, giving the nomination of the schoolmaster to the heirs of the devisor, and the determination of all doubts that might arise upon the will to the justices of assize. The inhabitants of Northleech, pursuant to the will, bought a house and lot for the school and employed a schoolmaster; but, the devisees having all died except one, the survivor, Thomas Apparye, conveyed the premises to his sons in fraud of the trust; and the heir of Westwood also entered, claiming that the trust was void. The inhabitants and the schoolmaster then jointly filed a bill in chancery, and the lord chancellor, Sir Christopher Hatton, referred the case to the justices of assize, pursuant to the will, who reported that the school should be incorporated, and the premises then conveyed to the schoolmaster and his successors, and an order was made by the chancellor in accordance with this report. Afterwards, a decree to the same effect was obtained from Sir John Pickering, lord keeper of the great seal, and still later this decree was confirmed by Sir Thomas Egerton who succeeded Sir John as lord keeper. The statute of James incorporates the school by the name of "The schoolmaster and usher of the free grammar school of Hugh Westwood, Esq., of the town of Northleech," and *Page 396 
provides that the corporation "shall have, hold and enjoy the premises, the statute of mortmain or any other law or statute to the contrary in any wise notwithstanding." It also provides for the payment to William Westwood, the heir of the devisor, of one hundred and sixty pounds for the surrender of his rights in the premises; and for an annuity of thirty pounds a year for life to Eustace Apparye, "in consideration of his yielding up of his said lease and conveyance of the said parsonage and premises."
There could be no stronger proof that the peculiar law of charitable uses, as afterwards understood, was at that time unknown in England, than is afforded by this case. If that law had prevailed, the remedy would have been simple. An information in chancery, in the name of the attorney-general, would speedily have forced the devisees or their heirs to found the grammar school pursuant to the will. Instead of this, a somewhat incongruous suit is commenced in the joint names of the inhabitants of Northleech and the schoolmaster; and although the lord chancellor made a decree in the case, which for some reason it was found necessary to have confirmed, first by Lord Keeper Sir John Pickering, and afterwards by Sir Thomas Egerton, who became lord keeper in 1596 (39 Elizabeth), yet the powers of all these high officers combined seem not to have been successful in establishing this grammar school until 1606, ten years afterwards; and then only by first compromising with all the claimants, and then procuring an incorporation in the names of the schoolmaster and usher, and vesting the title in them by direct act of parliament. Precisely what the obstacle was which prevented for so long a time the establishment of this use, does not appear. It may have been the want of a proper party to prosecute the suit; that is, to represent the only real beneficiary, the public.
These three cases, viz., Porter's case, that upon the will ofSir Richard Fulmerston, and that of the Free Grammar School ofNorthleech, all occurring at the same precise period. *Page 397 
seem to have roused the attention of the English people, and to have stimulated to a rapid growth the law of charitable uses; the seeds of which, planted in the statute of 23 Henry VIII., had already taken root in that of 1 Edward VI., ch. 14. Informations in the name of the attorney-general, and the statutes of 39 and 43 Elizabeth, were the first indications of this growth.
Passing over the statute of 39 Elizabeth, which it is unnecessary particularly to notice, I come to that of 43Elizabeth, which has given rise to so much conflict of opinion both in England and in this country, one class of jurists tracing the law of "charitable uses" mainly to this statute, and the other insisting that it was merely designed to provide a new mode of enforcing such uses, but added nothing to the power of the court over them.
To appreciate fully the motives which led to the passage of this act, as well as to the proceeding by information in the name of the attorney-general, it is necessary to notice one or two distinctions not yet particularly adverted to. In the first place, we must distinguish charity in a legal sense from acts of mere liberality or benevolence. To constitute a "charity," the use must be public in its nature. A trust created for the use of a single individual or of a family is not a charity. In the case of Ommanney v. Butcher (1 Tur. Russ., 260), the master of the rolls says: "It is competent to a testator to direct his executors to give to his poor relations; that is not a charity, but it is a trust to give to poor relations." Again he says: "There is no case in which private charity has been made the subject of disposal in the crown, or been acted upon by this court. The charities recognized by this court are public in their nature."
Another distinction is, between those cases where the use is for a corporation or some recognized public body capable of bringing a suit, and cases where no beneficiary competent to come into court as a party is designated. There is no doubt that where the beneficiary of the use for *Page 398 
which a trust was created for any of the purposes enumerated in the statute of Elizabeth was a corporation, as a college, an incorporated hospital, school, or the like, the court of chancery had jurisdiction, prior to either of the statutes of Elizabeth,
to enforce the use upon an original bill in the name of the corporation; and as such trusts were afterwards recognized as "charities," to this extent it may be justly said that the court of chancery had an inherent jurisdiction over charitable uses prior to and independent of that act.
It is equally plain that, where no beneficiary competent to sue was named, as where the trust was created in general terms, as to establish or found a public school, an asylum for the poor, or the like, without designating any particular persons or body of persons to be benefited, there was no legal means whatever, prior to the statutes of Elizabeth and to the use of informations in the name of the attorney-general, of enforcing the execution of the use. Although such uses were held good by the courts in proceedings in behalf of the crown, under the statute of 1Edward VI., ch. 14., for a forfeiture of the property (Adams Lambert's case, 4 Coke, 1046), so that the right of the trustee to the property was recognized; yet there was no legal mode in which such trustee could be compelled to perform the trust, because no party would exist competent to bring a suit for that purpose. Even in cases where the particular locality or town to be benefited by the use was named, although suits had been sometimes brought and sustained in the name of "the inhabitants" of such town, or in the name of several individuals in behalf of themselves and all others interested in the use, yet the history of the case of the Free Grammar School of Northleech suggests a doubt whether this practice was not attended with serious difficulty. We see, therefore, the imperious necessity which existed for some new mode of proceeding, by which public uses of this general nature could be enforced, as well as the reasons for the peculiar *Page 399 
kind of tribunal created by the statutes of 39 and 43Elizabeth. The proceedings before the commissioners were not in the form of a suit inter partes; but the commissioners were to inquire "as well by the oaths of twelve men or more of the county, as by all other good and lawful ways and means." They could proceed, therefore, upon such information as they could obtain, and were not governed by any technical rules. One principal object of the statute manifestly was to avoid this difficulty as to parties.
Informations in the name of the attorney-general were another device to meet the same difficulty. The uses to be enforced being public in their nature, these informations brought the real beneficiary, the king in his character of parens patriæ, before the court, through his legal representative the attorney-general. This remedy was entirely independent of the statute ofElizabeth, being based solely upon the ordinary judicial power of the court combined with the prerogative of the crown, and was so apt and appropriate that it is a matter of surprise that it had not been sooner resorted to.
But the providing of a remedy for a class of uses which could not be enforced by any existing form of proceeding, although the principal was nevertheless not the sole motive for the enactment of the statute of 43 Elizabeth. It had two other objects. One was to specify the uses excepted out of the statute of 23 HenryVIII., ch. 10, being the uses called "good and godly" in the preamble to the statute of 1 Edward VI., but afterwards more appropriately termed "charitable." The other was to relieve this favored class of trusts from the operation of some of the stringent rules of the common law. To prove the first of these objects, more can hardly be needed than to glance at the statute of Henry VIII., with its sweeping condemnation of uses in general; then at the preamble to the statute of 1 Edward VI.,
with its imperfect specification of charitable uses, and finally at the embarrassment which must have been created *Page 400 
by the want of such a specification. It was evidently, in part, to meet the difficulty of determining what uses were to be deemed charitable, as distinguished from superstitious, that the statute of Elizabeth was passed.
But I have said that another object was to exempt charities from some of the more rigid of the common law rules applicable to trusts. This is, I think, plainly to be inferred: First. From the language of the statute itself. Its phraseology is peculiar: "Whereas, lands, tenements, rents, annuities, profits, hereditaments, goods, chattels, money, c., have been heretofore given, limited, appointed and assigned," c. Why were these words "limited, appointed," c., used instead of the ordinary words, granted, devised, bequeathed, c.? This could not have been accidental, because the statute was drawn by Sir Francis Moore, to whom the duty was specially assigned by parliament. (Duke onUses, by Bridgman, 122, note.) Now, an eminent lawyer, like Sir Francis, would never have departed so widely from the ordinary legal language without an object; and the only conceivable object is, to uphold certain uses which, by the established rules applicable to grants, devises, bequests, c., would be void. But: Second. That this was one of its objects, if not apparent upon the face of the statute, is most abundantly shown by the construction put upon it by the courts, and by the uniform practice under it. The first case to which I will refer to show the force given to the words "limited and appointed" is that of Jesus College or Flood's case (Hob., 136; Duke,
78). In 25 Elizabeth, one Griffith Flood had devised certain lands first to his wife for life, then to his daughter for life, and afterwards to the principal, fellows and scholars of Jesus College, in Oxford. The estates for life being ended, the heir of Griffith Flood entered. A case was then made, which was referred to Chief Baron Tanfield and Lord Hobart; and the latter reports their decision as follows: "We agreed that the devise was void in law, because the statute of wills did not *Page 401 
allow devises to corporations in mortmain; but yet we hold it clearly within the relief of the statute of charitable uses, 43Elizabeth, under the words `limited and appointed.'" This case was decided only fifteen years after the statute ofElizabeth was passed. Two years later, Collison's case,
called, in Duke, Rolt's case, arose before Lord Keeper Bacon. (Hob., 136; Duke, 73.) Collison, in the 15th Henry VIII., had devised a house to his wife for life, and then to feoffees, in trust, to keep it in repair, and "to bestow the rest of the profits upon the reparation of certain highways." The case was between the parishioners and Rolt, who claimed as heir, and was referred, like the last case, to Lord Hobart and the chief baron. Hobart reports their decision thus: "And we resolved clearly that it was within the relief of the statute of 43 Elizabeth. For though the devise were utterly void, yet it was within the words `limited and appointed to charitable uses.'" The objection to the devise is not stated in Hobart, but Duke shows that it was that the devise was made before the statute of wills. In 1622, five years after Collison's case, Stoddard's case was decided in chancery. Stoddard had bequeathed by parol a yearly rent of £ 10, out of his house called the Swan, with one hundred marks, in the Old Jewry, London, for the maintenance of two scholars in Oxford and Cambridge; and directed one Hugh, a scrivener, to reduce it to writing, which was done. The will was held good. Duke says: "For, although by law a rent cannot be created without deed or will in writing, yet this nuncupative will was good to create the rent to a charitable use, by the words of the statute, `a limitation or appointment;' for, although it be not a good gift, yet it is a good limitation or appointment." (Duke, 81.) A few years later the case of Platt v. St. John's College came before Lord Keeper Coventry. (Cas. in Ch., 267; Duke, 77.) The ancestor of Platt had devised his lands to the college by a wrong name, "but the lord keeper decreed it a good appointment for a charitable use within the statute of 43 Elizabeth, *Page 402 
although before the statute no such decree could have been made."
These four cases, decided upon the heel of the statute ofElizabeth, conclusively prove that whatever may have been the object of the statute, its effect, as construed by the courts, was to cure all defects in gifts to charitable uses, whether such defects depended upon the rules of the common law, or upon positive statutory provisions.
But there are several cases which expressly declare that such was its object and intent. In the case of Christ's Hospital. v.Hawes, which arose in 1620 (Duke, 84), a tenant in socage had devised all his lands to a hospital, although by the statutes of 32 and 34 Henry VIII. he was authorized to devise only two-thirds. It was insisted that this was good for the whole land as a limitation and appointment under the 43d Elizabeth, on the ground that the object of that statute was to supply all defects in assurances for charitable uses; and, according to Duke, the lords commissioners, keepers of the great seal, would have so held, but the parties agreed. Again, in Attorney-General v.Rye, before Lord Keeper Wright, in 1703 (2 Vern., 453), a tenant in tail had devised lands for the support of a schoolmaster, and other charitable uses. The question was whether such a devise was good without fine or recovery; and the lord keeper held that "the intent of the statute of Elizabeth
being to make the disposition of the party as free as his mind, and not to oblige him to the observance of any legal forms, the devise was good."
It is plain from these cases, as well as from the whole series of subsequent cases on the subject, that the law of charitable uses, as afterwards administered, derived much of that peculiar force by which it was made to supersede most of the technical rules of the common law applicable to trusts, as well as many positive statutes, from the construction thus given to the words "limited and appointed" in the statute of Elizabeth. This, however, was not the *Page 403 
only source of the peculiar features of that law. As we have seen, the same causes which produced the statute of Elizabeth
led also to the practice of filing informations in chancery in the name of the attorney-general, and with these informations was introduced into the administration of charities some portion of the royal prerogative, which contributed, in combination with the broad construction given to the statute, to produce the charitable code of England. It seems to me clear that all that is distinctive and peculiar in the law of charities is to be traced to one or the other of these sources.
Although, as before remarked, there was a class of charitable uses of which the court of chancery took cognizance upon original bill, prior to the statute, that is, uses created for the benefit of corporations, or of recognized public bodies, such as towns, yet the jurisdiction exercised in such cases, so far as we have any authentic evidence on the subject, was simply the ordinary jurisdiction of the court over trusts. It does not appear from any record of those cases, which has come down to us, that the court ever assumed, prior to the statute of Elizabeth, any of those extraordinary powers in respect to charities which it so liberally exercised afterwards; and when to this negative proof is added the fact that in all the early cases the judges uniformly referred to the words "limited and appointed," in the statute, as the authority for their decisions, little doubt, as it seems to me, can remain that we are to look to the statute as the principal source of this peculiar jurisdiction. This conclusion is still further strengthened by the fact that, since the statute of Elizabeth, no uses have been regarded as "charitable," in a legal sense, except those which were within the letter or spirit of the statute. Judge Story says: "It is very certain also, that since the statute of Elizabeth no bequests are deemed within the authority of chancery, and capable of being established and regulated thereby as charities, except bequests for the purposes which *Page 404 
that statute enumerates as charitable, or which by analogy are deemed within its spirit and intendment." (2 Story's Eq. Jur.,
§ 1155.) I shall cite but a single case to show the truth of this remark, as the point admits of no dispute. In Monroe v. Bishopof Durham (9 Ves., 399), the master of the rolls, Sir William Grant, says: "Is this a trust for charity? Do purposes of liberality and benevolence mean the same as `objects of charity?' That word, in its widest sense, denotes all the good affections men ought to bear to each other; in its most restricted and common sense, relief of the poor. In neither of these senses is it employed in this court. Here its signification is derived chiefly from the statute of Elizabeth. Those purposes are considered charitable which that statute enumerates, or which, by analogy, are deemed within its spirit and intendment." In the same case, which afterwards came before the chancellor upon appeal (10 Ves., 522), Lord Eldon says: "Looking back to the history of the law upon this subject, I say, with the master of the rolls, that a case has not yet been decided in which the court has executed a charitable purpose, unless the will contains that which the law acknowledges to be a charitable purpose." It is plain that by the word "law," as here used, the chancellor meant the statute of Elizabeth. Again he says, speaking of that statute: "I believe the expression `charitable purposes,' as used in this court, has been applied to many acts described in that statute and analogous to those, not because they can with propriety be called charitable, but as that denomination is, by the statute, given to all the purposes described."
Now, there were many other uses for benevolent purposes, which, independently of the statute, would have commended themselves to the favor of the court as strongly as those enumerated in it. If, then, the peculiar law of charities existed at common law, prior to the statute, how did it happen that it was confined in its application to the particular uses there specified? This restriction is perfectly *Page 405 
in accordance with the supposition that the law was founded upon the statute, but somewhat difficult of explanation upon any other theory.
In my reference to authorities I have confined myself mainly to those which were either cotemporary with the statute ofElizabeth, or immediately prior or subsequent thereto, because I hold it to be clear that Lord Ellesmere, Sir Edward Coke, Sir John Popham and other eminent lawyers of that period must have better understood the state of the law in their own times, and the effect and object of a statute just then passed, than any lawyers, however distinguished, who lived a century and a half afterwards. The language of Lord Hardwicke, in Corporation ofBuford v. Lenthall (2 Atk., 550), shows how liable we are to be misled by the modern cases. He says: "The courts have mixed
the jurisdiction of bringing information in the name of the attorney-general with the jurisdiction given them under the statute, and proceed either way according to their discretion." It is entirely hopeless, therefore, to attempt to ascertain the extent of the original jurisdiction of the court, unless attention is principally confined to a period anterior to this commingling of jurisdictions. For similar reasons I have omitted to refer to the American cases, which are in conflict with each other. To ascertain the nature of charitable uses we must look to the records, in which alone the origin and history of those uses are to be found.
It follows from this reasoning that, in determining the extent of the jurisdiction of the courts of this state over charitable trusts, we are to look to the jurisdiction exercised by the court of chancery in England over trusts in general. It having been held by this court, in the case of Williams v. Williams (4Seld., 525), that trusts for religious and charitable purposes are not within our statute of uses and trusts, or that concerning the creation of perpetuities, we are without any restrictions upon this class of trusts, except *Page 406 
those which are derived from the rules and principles of the common law. We are to look, therefore, to those principles to determine the validity of this devise. As charitable uses, like all other uses, comprise a trust as well as a use, it is obvious that they are liable at common law to two classes of defects, one affecting the trust and the other the use. To constitute a valid use, there must be, in all cases, first, a trustee legally competent to take and hold the property; and secondly, a use for some purpose clearly defined.
Now, if it be admitted that the court of chancery in England, in its anxiety to support uses deemed specially meritorious, had, independently of the statute of Elizabeth, somewhat relaxed the rigid rules of the common law in regard to the certainty required in the specification of the use, there is still no evidence that it ever assumed to dispense with that rule which required that there should in all cases be a competent trustee of the fund.
It is true that where trustees capable of taking the legal estate were originally appointed, so that a valid use was in the first instance raised, and the case was thus brought within the jurisdiction of the court of chancery, that court would not afterwards suffer the use to fail, but would supply any defect which might arise in consequence of the death or disability of the trustees by appointing new trustees in their place; but when no competent trustees were in the first instance appointed, so that no legal estate ever vested, of course no use was raised, and the court of chancery acquired no jurisdiction of the case.
The want of a competent trustee is precisely that which distinguishes this case from that of Williams v. Williams
(supra), decided by this court. In that case, the disputed legacies were given to the trustees of an incorporated society, and to three individuals by name. This circumstance is referred to and relied upon by the court. Denio, J., says: "There is here a good trustee to take the funds *Page 407 in the first instance; and a succession of trustees may be provided by the court, by new appointment, as often as circumstances may require. The trust is for the education of the children of the poor, at a particular institution of learning, which I presume to be an incorporated academy, and a rule of ready application is given for selecting the objects of the testator's bounty." No inference can be drawn from the decision in that case that the court would have supported the legacy if given to a voluntary unincorporated society.
We have one direct authority, occurring just about the time when the statute of Elizabeth was passed, showing that a charitable devise to persons unincorporated could not then be sustained. I refer to the case of The Mayor, c., of Reading v.Lane (Duke, 81). There a devise was made to "the poor people maintained in the hospital of St. Lawrence, in Reading, for ever." No designation of any unincorporated body could be more definite than this; and yet it was conceded that they could not take. The devise, however, was sustained as a good devise to the mayor and burgesses, who were a corporation, and authorized to take lands in mortmain.
There is little in the history of charitable uses in England to encourage the courts of this country in violating the ordinary rules of law in their efforts to sustain a particular class of trusts. All partial legislation and strained judicial construction in favor of particular interests tend to disturb that social equality which general and uniform laws, operating in connection with the natural impulses of men, are calculated to produce. Thus, the law of charitable uses in England found its appropriate finale in the statute of 9 George II., ch. 36, which cut off all such uses, if charged in any way upon lands, unless created by deed twelve months before the death of the donor. The preamble to that statute is as follows: "Whereas, gifts or alienations of lands, tenements or hereditaments, inmortmain, are prohibited or *Page 408 
restrained by magna charta and divers other wholesome laws as prejudicial to and against the common utility, nevertheless this public mischief has of late greatly increased, by means of large and improvident alienations or dispositions, made by languishing or dying persons, or by other persons, to uses called charitableuses, to take place after their deaths, to the disherison oftheir lawful heirs: for remedy whereof be it enacted," c.
We may look for legislation of the same stringent character here, if our courts follow the example of the English chancellors in applying a peculiar and partial system of rules to the support of charitable gifts. My convictions are decidedly against both the policy and legality of such a course; and I am constrained, therefore, to hold that a devise to an unincorporated missionary society is void.
To avoid misapprehension, it may be proper to add that nothing which has been said is intended to deny the power of courts of equity in this state to enforce the execution of trusts created for public and charitable purposes, in cases where the fund is given to a trustee competent to take, and where the charitable use is so far defined as to be capable of being specifically executed by the authority of the court, even although no certain beneficiary other than the public at large may be designated. For example, devises or bequests to trustees for the purpose of founding a public library, a school, a hospital, or the like, create legal and valid trusts. This is precisely the class of trusts, as already shown, which gave rise both to informations in chancery, in the name of the attorney-general, and to the statute of 43 Elizabeth. The remedy afforded by the statute has no application in this state; but the remedy by information, so far as it was a common law remedy, is as available here as in England, although it must undoubtedly be modified so as to conform to our different modes of proceeding. Informations have been said to be a prerogative remedy, and it is true that the jurisdiction exercised upon them was in some degree *Page 409 
strengthened and extended by a resort to the royal prerogative; but it is nevertheless plain that such informations were the natural result of the application of common law principles and forms of proceeding to those particular cases, and that they could be and were sustained independently of prerogative. Here this remedy must assume the form of an ordinary suit in the name of the attorney-general, or perhaps of the people of the state, and would be limited in its scope by the principles of the common law. I see no reason why, to this extent, it may not be administered by our courts.
The judgment of the supreme court in this case should be affirmed.