GEORGE HUTCHINS'S EXECUTOR

*v.*

HENRY GEORGE, et al.

A bequest for the distribution of books in which the author describes the system by which the land-owners of the country hold the title to their lands as robbery, is not such a charity as the courts will enforce.

*Mr. George A. Vroom,* for complainant.

*Mr. George T. Woodhull,* for defendant, Henry George.

*Mr. Schuyler C. Woodhull,* for defendant, Mary Hutchins.

*Mr. C. V. D. Joline,* for defendant, James Hutchins.

BIRD, V. C.

William S. Braddock, the executor of the last will and testament of George Hutchins, deceased, by his bill, asks for the con-

struction of the will of said decedent. The will, first, makes provision for the wife of the testator, and makes other disposition of a small amount of his property, and then, and lastly, makes the provision for the construction of which this bill is filed:

"Lastly, all the rest and residue of my estate, of any and every form, kind and description whatsoever, I hereby give, devise and bequeath, under the name of 'The Hutchins Fund,' to Henry George, the well-known author of 'Progress and Poverty,' his heirs, executors and administrators, in sacred trust, for the express purpose of 'spreading the light' on social and political liberty and justice in these United States of America, by means of the gratuitous, wise, efficient and economically conducted distribution all over the land of said George's publications on the all important land question, and cognate subjects, including his 'Progress and Poverty;' his replies to the criticisms thereon; his 'Problems of the Times,' and any other of his books and pamphlets which he may think it wise and proper to gratuitously distribute in this country; provided, first, that the said George, his heirs, executors and administrators, shall regularly furnish true annual reports of the management and disbursements of the said 'Hutchins Fund' to the paper called 'The Irish World and the American Industrial Liberator,' or its acknowledged successor, and shall also annually mail, or otherwise send, a copy of said paper containing such annual reports to each of the following persons, to wit, my aforementioned wife, Mary Hutchins, now of this place; William S. Wood, now of Parker, county of Randolph, State of Indiana, and James Hutchins, now of Selma, county of Delaware and State of Indiana; and provided, second, that said George, his heirs, executors and administrators, shall cause to be inserted or printed opposite the title-page of every free copy of his books, distributed by means of this fund, this my solemn request, virtually, to wit, that each recipient shall read it, and then circulate it among such neighbors or other persons as in his best judgment will make the best use of it."

The bill shows that the executor had been warned by the heirs-at-law and next of kin of the said testator that the said bequest is void, and that he will not be justified in attempting to comply with the provisions of the will respecting it. He prays, therefore, for the court to declare whether or not such gift, in trust, of the residue, is legal and valid, and whether it will be enforced in a court of equity or not; and whether, under the terms of the will, he is authorized to make sale of the real estate mentioned therein, and whether the said Mary Hutchins, the widow, is entitled to dower in the real estate; and, fourth, whether or not, if the said gift to the said Henry George be declared invalid, the

said testator died intestate as to the said residue, and in that case how shall the said residue be distributed; and, in case the said residuary clause be declared invalid, whether or not the said executor is authorized to sell the real estate, and, if so, as to the disposition of the proceeds thereof; and whether one-third of the proceeds of the sale shall be considered as personal estate and be distributed as such.

The defendants, Mary Hutchins, the widow, and George Hutchins, one of the legatees, insist that the said residuary clause is invalid, and therefore cannot be enforced; first, they insist that it is not a charitable bequest, within the meaning of the term as understood by all text writers and judges who ever have had occasion to pass thereupon.   Much reliance is placed upon the statute *43 Eliz.*, *ch. 4*, by the defendants.   They urge that every adjudication since that time has gone upon the theory that nothing will be supported of the character named which is not clearly and indisputably a charity.   It is said that this was the view presented by Chief-Justice Marshall in *Baptist Association* v. *Hart, 4 Wheat. 1*, in which he says: "We have no trace, in any book, of any attempt in the court of chancery, anterior to the statute, to enforce one of these vague bequests for charitable uses."   Notwithstanding this eminent authority, the opinion of the court in *Vidal* v. *Girard, 2 How. 127, 194*, seems to establish the fact that the court of chancery had such power and exercised it before the act referred to was passed.   And it is insisted that, whether or not the said statute be enforced in New Jersey, the spirit and intent thereof prevails.   *Thomson* v. *Norris, 5 C. E. Gr. 489, 522*.   And to support this, *Story's Eq.* § *1155* is cited.

What is a charity?   Since it often happens that definitions are framed from and for particular cases I will not attempt defining it, but will be content with the views of others of great experience and learning, and which are relied upon by counsel for defendants.   *Perry on Trusts* § *709*, is cited, where the learned editor says: "Charity has obtained a significance in law, and courts do not uphold or administer trusts for particular purposes which are not charitable within the meaning of the law."   Mr.

Hutchins *v.* George.

Story adds: "A bequest may, in an enlarged sense, be charitable, and not within the purview of the statute." Another authority, it is said, writes: "Such charitable bequests only as are within the letter and spirit of the statute are sustained," citing *Story,* §§ *1155, 1158, 1164; Kendall* v. *Granger, 5 Beav. 300; Williams* v. *Williams, 8 N. Y. 525; Brown* v. *Yeale, 7 Ves. 50, note; Owens* v. *Missionary Society, 14 N. Y. 380, 397, 403.*

Again, it is said that all of the purposes to which any charitable bequests can be made, may be classified under those which are ecclesiastical, educational or eleemosynary. *Attorney-General* v. *Calvert, 23 Beav. 248.* And it is claimed that the gift which we are now considering cannot be brought within either of these classifications; for, it is said, that in no sense does the gift in question have a tendency to benefit or to improve mankind, being in no sense a school of learning to educate mankind. The claim, further, is that there must be an indubitable benefit, a tendency to humanize, to elevate and to improve mankind before a gift of this nature can be declared valid or enforced by the courts.

It is said, further, that in *Brown* v. *Pancoast, 7 Stew. Eq. 321,* Chancellor Runyon said that a gift by the testator for the purpose of creating a fund, the income of which should be devoted to the purchase of books in founding a useful library, was charitable. Counsel says, with respect to this, " Incontestibly this was a good bequest, and should be enforced; " but says : " Far different is the purpose under consideration; here the bequest is to spread light on the land question, by purchasing and distributing books written by the trustee on that question. And it is a bequest for spreading abroad a man's theories on the question of land tenures and their abuses, and cognate subjects."

A bequest, then, of a fund to perpetuate a useful library is good. The bequest under consideration is to spread light on the land question, in other words, on the question as to who shall hold the title to lands, or how that title shall be held, or for whose benefit. Now, if the gift to establish a library without classification of the books or without reference to their character

(except that they be useful) is good, certainly a gift to establish a library to be composed of a certain class of books, or of books upon certain subjects, would be good also.   Would not a gift for the purpose of founding an institution to publish the works of Newton, or of Bacon, or of Milton, or of Shakespeare, or of Edwards, or of Bancroft, or of Irving, or of McCosh, or of Webster, or of Marshall be good?   Incontestibly so.   If not, then I do not see how we can sustain the numerous gifts to the Bible Society, within the control of various denominations of Christians in this country.   But, if I am right in this, then it must follow that a gift to circulate any portion of these works, or any one of them, would also be lawful.   And look to high authority.

There can be no doubt but that the circulation of one book may be the object of a testator's bounty.   A testatrix provided that the residue of her estate should be applied towards the printing, publishing and propagating of the sacred writings of the late Joanna Southcote.   The heir filed a bill alleging that the gift for such purpose was either void in law on the ground that the writings were of a blasphemous and profane character, or that the trust so declared was for the propagation of doctrines subversive to the Christian religion.   It seems that Joanna Southcote taught in her books that she was with child by the Holy Ghost, and that a second Messiah was about to be born of her body.   In speaking of her Sir John Romilly, master of the rolls, said :  " In the history of her life, her personal disputations and conversations with the devil, her prophesies and her inter-communings with the spiritual world, I have found much that, in my opinion, is very foolish, but nothing which is likely to make persons who read them either immoral or irreligious."   Again, he says :  " I cannot say that the bequest of a testator to publish and propagate works in support of the Christian religion is a charitable bequest, and, at the same time, say that if another testator should select for this purpose some three or four authors, whose works will, in his opinion, produce that effect, such a bequest thereupon ceases to be charitable.   Neither can I do so if the testator should select one single author."   The bequest was sustained.   *Thornton* v. *Howe, 31 Beav. 14.*

Hutchins *v.* George.

If it be so that a bequest for the distribution of the works of Joanna Southcote, or of the Bible, by an institution founded for that purpose is valid, then it is clear that a bequest for any other single and definite purpose which will, if carried out, have a tendency to enlighten or improve mankind, with respect to a given subject or theory, such gift must also be valid, as a charity, and can be enforced by the courts. It will be noted that I say to enlighten or to improve mankind. And it is not necessary that I should more particularly define the object to be had in view in every such discussion. Certainly, if the purpose of the testator was to disseminate doctrines immoral in their character, tendency, or influence, they could not be called charitable in any sense, nor could they in any sense be said to elevate or improve mankind. I cannot but add that it is not the individual judgment which is to be the guide in every such case, for, manifestly, that may be regarded as hostile to the public welfare by one individual, which by another would be deemed most useful or beneficial. This assertion is founded upon what we are taught in all the pages of history. It is everywhere written that the efforts of enlightened individuals, upon one hand, to break through the clouds of darkness and of ignorance, or to overcome oppression and resistance, have, upon the other hand, been as stoutly opposed, if not by persons equally intelligent, yet by persons enjoying the benefits and advantages which came to them from the existing condition of things, and placed them in positions of supremacy, or of happiness above their fellows. Suffice it to say that our own national history had its origin in this great truth, and gives us numerous illustrations of the inestimable value of it.

Now, with these suggestions as to the law, and as to the fundamental principles which should control, let us see what it is which the testator in the case before us desires to disseminate. A few quotations from the books which have been offered in evidence are essential, and a few will suffice; those which have been presented by counsel for the defence, I will give. Chapter 1, of Book 7, in the work on "Progress and Poverty," the author heads with the phrase, "The injustice of private property

in land." Amongst many of his declarations in that chapter, he says :

"There is in nature no such thing as a fee simple in land. There is on earth no power which can rightfully make a grant of exclusive ownership in land. If all existing men were to unite to grant away their equal rights, they could not grant away the right of those who followed them. For what are we but tenants for a day?  *  *  *  Let the parchments be ever so many, or possession ever so long, natural justice can recognize no right in one man to the possession and enjoyment of land that is not equally the right of all his fellows. Though his titles have been acquiesced in by generation after generation, to the landed estates of the Duke of Westminster, the poorest child that is born in London to-day, has as much right as his eldest son. Though the sovereign people of the State of New York consent to the landed possessions of the Astors, the puniest infant that comes wailing into the world in the squalidest room of the most miserable tenement house, becomes at that moment seized of an equal right with the millionaires. And it is robbed if the right is denied. *  *  *  The wide spreading social evils which everywhere oppress men, and amid an advancing civilization, spring from a great primary wrong—the appropriation as the exclusive property of some men of the land on which, and from which, all must live.  *  *  *  As for the deduction of a complete and exclusive individual right to land from priority of occupation, that is, if possible, the most absurd ground on which land ownership can be defended. Priority of occupation gives exclusive and perpetual title to the surface of a globe on which, in the order of nature, countless generations succeed each other. Had the men of the last generation any better right to the use of this world than we of this? or the men of a hundred years ago? or of a thousand years ago?"

The title of chapter three, "Claim of Land-Owners to Compensation," suggests the contents of it, namely :

"The truth is, and from this truth there can be no escape, that there is and can be no just title to exclusive possession of the soil, and that private property in land is a bold, bare, enormous wrong, like that of chattel slavery.  *  *  *  The examination through which we have passed has proved conclusively that private property in land cannot be justified on the ground of utility—that, on the contrary, it is the great cause to which are to be traced the poverty, misery and degradation, the social disease and political weakness which are showing themselves so menacingly amid advancing civilization. Expediency, therefore, joins justice in demanding that we abolish it.  *  *  *

"The land of Ireland—the land of every country, belongs to the people of that country.  *  *  *  The common right to land has everywhere been primarily recognized, and private ownership has nowhere grown up save as the result of usurpation.  *  *  *  Historically, as ethically, private prop-

Hutchins *v.* George.

erty in land is robbery. It nowhere springs from contract; it nowhere can be traced to perceptions of justice or expediency ; it has everywhere had its birth in war and conquest, and in the selfish use which the cunning have made of superstition and law."

In his work on "Social Problems" Henry George says :

"The more we examine the more clearly we see that public misfortunes and corruptions of government do spring from neglect or contempt of the natural rights of man.  *  *  *  The institution of public debts, like the institution of private property in land, rests upon the preposterous assumption that one generation may bind another generation.  If a man were to come to me and say, 'Here is a promissory note which your great-grandfather gave to my great-grandfather, and which you will oblige me by paying,' I would laugh at him, and tell him that if he wanted to collect his note he had better hunt up the man who gave it; that I had nothing to do with my great-grandfather's promises.  And if he were to insist upon payment, and to call my attention to the terms of the bond, in which my great-grandfather expressly stipulated with his great-grandfather that I should pay him, I would only laugh the more, and be more certain that he was a lunatic.  To such a demand any one of us would reply, in effect, 'My great-grandfather was evidently a knave or a joker, and your great-grandfather was certainly a fool, which quality you certainly have inherited, if you expect me to pay the money because my great-grandfather promised that I should do so.  He might as well have given your great-grandfather a draft upon Adam or a check upon the First National Bank of the Moon.'  *  *  *  While, as for the great national debts of the world, incurred as they have been for the purposes of tyranny and war, it is impossible to see in them anything but evil.  Of these great national debts, that of the United States will best bear examination ; but it is no exception."

Some observations seem to be necessary, in order to understand the full measure of the subject we are dealing with.  The sentiments or expressions, which I have above recited, are leveled at the foundation of laws and customs, as they have existed for many centuries, wherever civilization has had the slightest foothold ; are leveled at principles which, in all ages, where men have been at all enlightened and made progress from barbarism, have been fostered as amongst the foremost incentives to human action; and at principles which have, during all the period named, been regarded as the very bulwarks of freedom and stability amongst the nations of the earth.  Indeed, in one sentence, it may be said that nothing, excepting only the gospel,

has done so much towards lifting man from the degrading super-
stition and slavery of heathenism as the possibility, by generous
effort, of acquiring a certain foothold upon the soil which, if he
improves it, shall be his own, and shall descend as an inheritance
to his posterity, or shall be disposed of according to the owner's
will and pleasure. But our author, by a stroke of the pen, or an
act of legislation, would sweep away every thought, or sentiment,
or link, which binds individuals to locality, to home, to society
or to government, and send him adrift, without rudder, or sail,
or guiding star, or beacon light, or a tent to shelter, or a cabin
for himself or his little ones.

Take away this inducement to labor, that is, say to the
hungry, you have no more right to plough and to sow a given
tract of land than any other of the millions who tread the
earth, and if you do plough and sow and cultivate, another
has the same right to reap, or if you do these things and
die before you have gathered, strangers may enter and reap,
and your children, for whom you have wrought, may go crying
for bread; say to those who go a step beyond and waste the
energies of a lifetime in improving the soil, in erecting comforta-
ble dwellings and barns, that another has an equal claim, not
only to the soil itself, but to all that has been put upon it for
its adornment, and that even the distress of advanced years, and
the necessities of a growing household, will not protect the pos-
sessor, nor insure his posterity in a title thereto—then indeed will
the sweet, reviving, life-giving sunshine of our present civiliza-
tion disappear more rapidly than did the Roman at the appear-
ance of the Goths and Vandals. The laws, the customs, the
institutions amid which we have been brought up, and which have
shed that influence which we regard as hallowed or sacred upon
us, have so influenced us that we cannot look at this subject in
any other light than above expressed. These laws, customs and
institutions, may stand upon a false foundation, and may shed a
false or misleading light; but to ignore the fact of their influ-
ence, or the fact of their existence, cannot be conceived of for one
moment, and much less are we inclined to reject and overthrow
them when we consider that they have been sanctioned and

maintained by the judgment, the labor, and the skill of the best
and wisest of men, which the past generations have produced.
But the importance of the subject warrants another observation.
Suppose the theories of our author should prevail, and the de-
termination be to resolve society into its original elementary or
first principles—What is to be done with the billions of dollars
of improvements, which now beautify and adorn the earth?
Who would be entitled to them? Could another, who had spent
neither a moment of time nor a dollar in their construction, say
to the Astors or the Vanderbilts that he had an equal claim to
such improvements with them? Could the tramp say to the day
laborer, who, by dint of industry, had procured for himself the
title to a lot, and erected thereon a dwelling for himself and
family, that that was as much his dominion and inheritance?
And if such difficulties as these were to be securely removed or
overcome, and the wide world lay open before all men equally,
and all the laws on the subject of titles were abolished, and it
were to be considered that each man, woman and child had an
equal right to the whole and to every part, with all the other
millions of inhabitants, what then would the order of affairs be?
Or what then would be the sequence of the first demonstra-
tion? Indeed, it may be, there would be no human effort.
Perhaps if there was no such thing as a holding, as a title, as a
tenure, there would be no labor expended. In the whole social
system thus transformed, if not deformed, and the self-imposed
edict that no one had any right to the soil under his feet, except
during the momentary occupation, have we not then a picture of
what would ensue in the mighty hordes that roamed over Asia
nearly two thousand years ago?

While these suggestions show us the extent and importance of
the discussion, they do not seem to terminate the discussion. I
have said this question is not to be determined by the judgment
of a single individual, nor of a single court composed of many
individuals; but it is to be determined by the true reason or
spirit of law, as it has been declared and upheld for long periods
of time. And the law, as I have shown, for many centuries, has
acknowledged and sustained the right of individuals to hold title

to lands, to dispose of those titles at their own will and pleasure, and upon their death, if not otherwise disposed of, has provided that said lands descend to their heirs-at-law.

It is said, however, that while this is an historical fact, it is, nevertheless, only the semblance of a right, and has nothing to commend it but the veneration which we pay to antiquity. It is urged that this great fallacy, like many others, is doomed to vanish before the light of true inquiry. It is also claimed, that oftentimes the greater the wrong, the more deep-rooted and irresistible does it become; and that what has been growing for ages, and winning the admiration of men, because it fostered their greed and pampered their vices and sustained their indulgences, it will take ages to remove. It is claimed that these vices and indulgences, and this greed of mankind, have imposed the fetters which now enslave and degrade the millions of earth. This, of course, is upon the theory that our habits of thought have been such that we are at present unable to distinguish the truth from error. Nor have any of the enlightened men in former ages been protected by their nearer approach to the point of departure from falling under the same hallucination.

But the process of a proper mental training must be begun. The alphabet and spelling-book of a new departure must be learned. Although this is the work of time, it may be of ages, the beginning cannot be postponed. Illustrations, we are assured, may be had. The ignorance of the people during the feudal ages, and the hardships which they endured and submitted to at the hands of their chiefs, though few in number, were not removed nor overcome until generation after generation had gone down in the mighty struggle for freedom from that bondage which was gross in its character, debasing in its influences, and demoralizing upon the whole body politic. Century after century were human beings held in worse bondage, still, and sold like chattels in the public markets; and to remove this blight upon civilization, the discussion, though feeble in its inception, waxed warmer and warmer, throughout the ages, until horrid war came to the front, and marked an era of unexampled devastation and blood.

The brief glance above given shows us that the revolution contemplated involves every moral, social, political and economical problem ; and that the only hindrance to its triumph is said to be the ignorance, prejudice or selfishness of the rulers, sages and philosophers of the present age. Whilst it is both difficult and unpleasant to believe our moral capacities are so blunted or blinded as is indicated, and that nothing but another deluge can regenerate mankind, yet in this undertaking we have no concern, in that direction, any further than to survey the plan designed and declared to be a mark of safety for the people as against all social, political and economical ills. With this to guide us, I conceive the extent of our duty to be to declare whether or not it is within the pale of the law for the testator to undertake, by the means indicated, the work of accomplishing such a revolution.

And this brings me to the last and most serious view of this branch of the subject. Notwithstanding the practical working out of this problem by our author and his adherents involves our homes and our firesides, our church and our state, and all the institutions established and regulated thereby, yet there is one fundamental principle that lies so hard by, and is so interwoven with all the rest, that I cannot forget nor mistrust it, nor even venture to say that it, too, is not involved in this controversy—I refer to the liberty of speech and the freedom of the press. But it is asked, how is this principle involved? I answer, Much, every way. Think a moment, and it will appear plain. One testator says, by his bequest, circulate the Bible ; another, the tract ; and another, establish libraries which circulate everything that is not of an immoral tendency, and much that is, which issues from the press. In many of these last institutions, doubtless, may be found books most questionable in their character, including many infidel publications of every type. This fact was admitted on the argument. These, without the slightest discrimination, have been upheld by the courts as charitable institutions. It would be impossible, upon principle, to say otherwise ; for whenever the courts undertake the work of the critic or the censor, and to declare this or that is bad, or

this or that is good, when dealing with questions of this character, unless the book be irreligious or immoral, then, indeed, the system of charities, which is designed to elevate mankind by the diffusion of knowledge through books, must at once begin to decline. I am not required to say what the court should do, in case of a bequest providing for the circulation of an infidel or blasphemous or immoral publication. According to the enlightened training of the present age, we cannot believe that such a case will ever arise, although the generous efforts of many, the most God-fearing, do, though unintentionally, encourage the circulation of such books, by their indiscriminate donations establishing public libraries. Whether the courts could undertake the winnowing process, is not now material.

But the most that I can say of the books before me is that they are not indifferent on the subject of Christianity. It seems to be recognized throughout. I do not find anything in them of a rebellious or treasonable character, or that is directly calculated to foment public disturbances or to incite the masses of the people to revolt, although they contain many assertions to the effect that every one has an equal right with every other one to the land, and these assertions the author endeavors, by various forms of argument, to sustain and enforce, and sometimes by the use of statements couched in very strong language; yet, it cannot be said, so far as I have been able to ascertain, that any other principle or doctrine is comprehended, which should induce the court to refuse to aid in enforcing the trust, except as will hereinafter appear.

Now, can the court, according to its past history and former adjudications, lay its hand upon this gift and restrain the executor from such disposition of it, by declaring the bequest void or illegal because it is not a charity. In my judgment this would be contrary to the true spirit and meaning of the law, because, as I have intimated, I fear it would be aiming a blow at the liberty of speech and the freedom of discussion. This consideration is at the very threshold. The present advanced stage of civilization has no other bond so securely sealed, no other bond cemented by so many precious yet sometimes conflicting

Hutchins v. George.

interests, no other bond made so sacred by innumerable ties, recollections and historic events, as the bond that vouchsafes to us the liberty of speech and the freedom of discussion. I am sure that the most of those who enjoy this civilization, feel too proud of the vantage ground attained by the instruments of free speech and free discussion, to lay the foundations for the surrender of them, by depriving others of the use of such means, when they seek to advance their views with respect to fundamental principles which they insist would procure for us a still higher, nobler and purer civilization.

From these observations it will appear that, upon the whole case, I am disposed to sustain the bequest in the will, and would do so, notwithstanding the clear and strong expressions in the very learned and most able opinion in the case of *Jackson* v. *Phillips, 14 Allen 539, 571,* in which it is declared " that a trust to secure the passage of laws granting women, whether married or unmarried, the right to vote, to hold office, to hold, manage and devise property, and all other civil rights enjoyed by men, can not be sustained as a charity," were it not for the exception to be referred to. The reason given in that case is, that the bequest aimed directly and exclusively at the change of the laws, and that it was not for the court to determine whether laws were wise or unwise, but simply to expound them as they stand. It was observed, " Those laws do not recognize the purpose of overthrowing them or changing them in whole or in part as a charitable use." It seems to me that if this principle should be followed to all its logical consequences, all donations for the spread of the Bible, and to foreign missions to aid in the accomplishment of their work, would fall under judicial condemnation; for, most clearly, the work of spreading the gospel, as carried on by foreign missions, is successful only in proportion as it overturns and obliterates existing laws, customs, institutions and religions, whose origin is so remote as to be beyond discovery. And an endeavor to avoid a consequence so disastrous has induced me to pay no little attention to the subject-matter, and to intimate, as I have, that the cause of truth, virtue and good government can never suffer by the utmost liberality of discussion, even though the

courts, when called upon to sustain bounties, as charities, do so, unless such right of discussion should be abused.

The exception to which I have adverted has reference to what Mr. George says with respect to the claim of land-owners to compensation. He says:

> "It is not merely a robbery in the past, it is a robbery in the present—a robbery that deprives of their birth-right the infants that are coming into the world. Why should we hesitate about making short work of such a system? Because I was robbed yesterday, and the day before, and the day before that, is it any reason that I should suffer myself to be robbed to-day and to-morrow? Any reason that I should conclude that the robber has acquired a vested right to rob me?"

Again, he says:

> "Historically, as ethically, private property in land is robbery."

Clearly, the author in these passages, not only condemns existing laws but denounces the fact that the secure title to land, in private individuals, is robbery—is a crime. It is this aspect of the case which leads me to the conclusion that the court ought to refuse its aid in enforcing the provisions of this will. Whatever might be the rights of the individual author in the discussion of such questions in the abstract, it certainly would not become the court to aid in the distribution of literature which denounces as robbery—as a crime—an immense proportion of the judicial determinations of the higher courts. This would not be legally charitable. Society has constituted courts for the purpose of assisting in the administration of the law and in the preservation of the rights of the citizens and of the public welfare; but I can conceive of nothing more antagonistic to such purpose than for the courts to encourage, by their decrees, the dissemination of doctrines which may educate the people in the belief that the great body of the laws which such courts administer, concerning titles to land, have no other principle for their basis than robbery.

I have sought to overcome the view just expressed, by striving to bring the books of Mr. George within that branch of the opinion in *Jackson* v. *Phillips, supra,* which maintained that

Hutchins *v.* George.

efforts to produce a change in public opinion on the subject of slavery by the publication of books, newspapers, speeches and lectures, was charitable, but I have not been able to do so, for the reason given. However radical the works of Mr. George may be, however much in conflict with prevailing convictions or prejudices, I can find but the one thing in them that in any sense makes it my duty to say that the court cannot regard the bequest as charitable.

If I am correct in the foregoing views, the testator died intestate as to all of his estate not disposed of by the first three paragraphs of his will.

I will advise a decree in accordance with these views.