MARY HOLLAND et al., Appellants, *v.* HENRY ALCOCK, as Executer, etc., Impleaded, etc., Respondent.

The absence of a defined beneficiary, entitled to enforce its execution is, as a general rule, a fatal objection to the validity of a testamentary trust.
A power given to executors to select the beneficiary does not obviate the objection, unless the persons or corporations from among whom the selection is to be made, are so defined and limited that a court of equity would have power to enforce the execution of the trust, or in default of a selection to decree an equal distribution among all the beneficiaries.

*It seems* the fact that the trustee is competent and willing to execute the trust does not validate it; the validity or invalidity of a trust cannot depend on the will of the trustee.

The existence of a valid trust, capable of enforcement, is essential to enable one claiming to hold as trustee to withhold the property from the legal representatives of the alleged donor.

The English doctrine of trusts for charitable uses, as distinguished from private trusts governed by the general rules of law and the doctrine of *cy-pres*, do not prevail in this state, but the system established by the statute law of the state, of organizing corporate bodies with power to administer public charities, with the legal capacity to receive and hold property for that purpose, was intended to take its place. The nature and history of the English doctrine given and the authorities in this state upon the subject, collated and discussed.

The will of G. bequeathed his residuary estate, which consisted exclusively of personalty, to his executors, in trust, for the purposes expressed therein, as follows: " To be applied by them for the purpose of having prayers offered in a Roman Catholic church, to be by them selected, for the repose of my soul and the souls of my family, and also the souls of all others who may be in purgatory." *Held,* that the trust so attempted to be created was invalid; and that as to such residuary estate the testator died intestate, and the next of kin of the testator were entitled thereto, as there is no beneficiary in existence, or to come into existence, who is interested in or can demand the execution of the trust; that considering the trust is to pay over the fund to such Roman Catholic church as the executors might select (as to which *quære*), the objection of indefiniteness in the beneficiary would not be removed.

*It seems* that under the English statute of chauntries and other statutes prohibiting superstitious uses in force at the time, the trust in question would not have been recognized in that country as valid as a charity.

*It seems,* also, that the trust in question may not be impeached on the ground that the use to which the fund was attempted to be devoted was a superstitious use, as the English statutes against superstitious uses have no effect here. (U. S. Const. amendment, art. 1; state Const. art. 1, § 3.)

*Gilman* v. *McArdle* (99 N. Y. 451); *Power* v. *Cassidy* (79 id. 602); *Burrill* v. *Boardman* (43 id. 254) distinguished.

(Argued December 17, 1886; decided February 7, 1888.)

APPEAL from judgment of the General Term of the Supreme Court in the second judicial department, entered upon an order made May 11, 1886, which reversed a judgment in favor of plaintiffs entered upon an order overruling a demurrer to plaintiffs' complaint and which sustained the demurrer.

This action was brought by plaintiffs as the next of kin of Thomas Gunning, deceased, against the executors of his will, asking for an accounting, distribution and payment over of the residuary estate, which consisted entirely of personalty, and as to which plaintiffs claimed the testator died intestate. because of the invalidity of the provision of the will attempting to dispose of the same.

The provision of the will in question and the other material facts are stated in the opinion.

*E. H. Benn* for appellants. A beneficiary, who can come into court and compel the performance of the trust, is essential to a valid trust. (*Gilman* v. *McArdle*, 99 N. Y. 451; 12 Abb. N. C. 422, 423; *Levy* v. *Levy*, 33 N. Y. 97, 101, 102, 107; 4 Kent's Com. [2d ed.] 305, *note* 2; *Dawson.* v. *Small*, L. R., 18 Eq. 114; *Heath* v. *Chapman*, 2 Drew. 423; *West* v. *Shuttleworth*, 2 M. & K. 684; *In re Blundell's Trust*, 30 Beav. 360.) This bequest is void under the doctrine of superstitious uses or public policy. (Jarman on Wills, 495.) This invalid trust is not entitled to any more consideration from the courts than would a trust for any other purpose which the testator might attempt to create. (95 N. Y. 412, 413; *Levy* v. *Levy*, 33 id. 104.) Had we any such law in this state as the English law of charitable uses, this disposition of the testator's estate is, in no sense, an appropriation of the fund to charity. (*Mellick* v. *President*, etc., 1 Jacob, 180; *Detwiller* v. *Hartmann*, 37 N. J. Eq. 349; *Heath* v. *Chapman*, 2 Drew. 423.) The clause is also void for indefiniteness or uncertainty, and because it creates a perpetuity. (*O'Hara Will Case*, 95 N. Y. 411, 418; 12 Abb. N. C. 427; *Levy* v. *Levy*, 33 N. Y. 101, 104; *Beekman* v. *Bonsor*, 23 id. 299, 311; *Wager* v. *Wager*, 89 id. 166, 167.)

*I. Newton Williams* for respondent. It is only when the court decrees a trust invalid, or the disposition made by a certain clause of the will void, that it will construe the alleged doubtful or ambiguous clauses, and this is done to avoid multiplicity of suits. (*Bailey* v. *Briggs*, 56 N. Y. 412; *Wager* v.

*Wager*, 89 id. 163.) It cannot be claimed that the bequest contained in the third paragraph of the will is void because given for an alleged superstitious use. (Const. of the U. S., amendment, art. 1; Const. of N. Y., art. 1, § 3; *In re Hagemeyer's Will*, 12 Abb. N. C. 432.) This estate being personalty, the law does not limit or confine trusts as to personal property, except so far as suspension of the power of alienation or creating a perpetuity, and they may be created for any purpose not forbidden by law. (*Bucklin* v. *Bucklin*, 1 Keyes, 141; *Gott* v. *Cook*, 7 Paige, 534; *Gilman* v. *McArdle*, 99 N. Y. 453, 460–462.) There is no suspension of alienation contrary to the statute. [*Detwiller* v. *Hartmann*, 37 N. J. Eq. ——.) This trust is not forbidden by law, and is not contrary to public policy or public morality. (*Kehoe* v. *Kehoe*, 12 Abb. N. C. 427.) The *cestui que trust*, being so defined that the trust can be executed, there is no force in the contention made by respondents that the beneficiary is indefinite or uncertain, and the trust created by the third clause of the will is a valid trust. (*Power* v. *Cassidy*, 79 N. Y. 608; *Trustees, etc.* v. *Cosgrove*, 4 Hun, 364; *Beekman* v. *Bonsor*, 23 N. Y. 298, 310; *Holmes* v. *Mead*, 52 id. 332.) The third clause of the will is an absolute bequest of the residuary estate to the executors for the purpose of having prayers said for the repose of testator's soul, etc., and is a valid disposition of his estate, just as a bequest to his executors would be for the purpose of erecting a monument to his memory, or of publishing the literary books of the testator, or other like purposes that are held valid in law. (N. Y. Daily Reg. January 29, 1886; *Gilman* v. *McArdle*, 99 N. Y. 461; *Powers* v. *Cassidy*, 79 id. 608; Perry on Trusts [3d ed.], § 706.) Courts look with favor upon donations for a charitable or religious purpose, and endeavor to carry them into effect if it can be done consistently with the rules of law, and this bequest being for the support and maintenance of the church, for the saying of the prayers mentioned in the third paragraph of the will, the bequest will be upheld as a charitable use. (Perry on Trusts, §§ 701, 709.)

*David McClure* for defendant, Frederick Smyth, executor, ·etc. The purpose of the trust is not forbidden by law. ·(*Gilman* v. *McArdle*, 99 N. Y. 451; Perry on Trusts, 586; *Day* v. *Roth*, 18 N. Y. 448; *Holmes* v. *Mead*, 52 id. 343, 344.) The doctrine of superstitious uses is unknown to ·our laws. (Perry on Trusts, § 715; Hill on Trustees, 455; ¨Williams on Executors, 1055; 12 Abb. N. C. 427; *In re Hagenmeyer's Will*, 12 id. 432; *Gilman* v. *McArdle*, 12 id. 419; *Appeal of Seibert & Bradley,* ^Weekly Notes of Cases October, 1886, Albany Law Journal, November 27, 1886.) The purpose of the trust is one recognized by law and favored by the courts. (*Holmes* v. *Mead*, 52 N. Y. 339; *College of .St. Mary, etc.,* v. *Attorney-General*, 6 H. of L. Cases, 189; 12 Abb. N. C. 424; *In re Schouler*, 134 Mass. 426; *Reed* v. *Hodgens*, 7 Irish Eq. R. 17.) The objection that the trust fails as a trust for the want of a living beneficiary does not apply to a charity under the English law, and such part of the English common law of charitable uses became the law of this state. (*Williams* v. *Williams*, 8 N. Y. 527; *Owens* v. *Missionary Society*, 14 id. 298; *Beekman* v. *Bonsor*, 23 id. 298; Perry on Trusts, § 78.) The trust is not indefinite or uncertain as to the beneficiary. (*Beekman* v. *Bonsor*, 23 N. Y. 310; *Power* v. *Cassidy*, 79 id. 602; *In re O'Hara's Will*, 95 id. 417; *Prichard* v. *Thompson*, id. 76; *Burrill* v. *Boardman*, 43 id. 254; *Blandsley* v. *Selectmen of Bridgeport*, 3 At. Rep. 557; *White* v. *Fisk*, 22 Conn. 32; *Zeisweiss* v. *James*, 63 Penn. St. 465.) There are here all the essential requisites of a valid trust. (*Gilman* v. *McArdle*, 99 N. Y. 458; *Beekman* v. *Bonsor*, 23 N. Y. 310.)

RAPALLO, J. The third clause of the testator's will is in the following words: "All the rest, residue and remainder of my estate I give and bequeath to my said executors, to be applied by them for the purpose of having prayers offered in a Roman ·Catholic church, to be by them selected, for the repose of my soul and the souls of my family, and also the souls of all others who may be in purgatory." The validity of this clause ·is the question now presented for adjudication.

The action is brought by five nieces and a nephew of the testator, who claim to be his next of kin and heirs-at-law, and, as such, entitled to his residuary estate in case the disposition thereof attempted to be made by the third clause of the will is adjudged to be invalid. The estate consists wholly of personal property, and amounted at the time of the testator's death, in 1882, to about the sum of $28,000. By the second clause of his will the testator devised and bequeathed all his estate, real and personal, to his executors, *in trust*, for the uses and purposes set forth in the will, which were to pay certain legacies, amounting in the aggregate to about $16,500, and to apply the residue as directed in the third clause, before recited. That clause must, therefore, be regarded as creating, or attempting to create, a trust of personal property for the purpose specified. The plaintiffs claim that the trust thus attempted to be created is void; that as to the residuary estate the testator died intestate, and that distribution thereof should be made among the next of kin, etc. The defendant Alcock, one of the executors, demurred to the complaint. At Special Term the demurrer was overruled and the plaintiffs had judgment. On appeal to the General Term that judgment was reversed and judgment was rendered in favor of the defendant Alcock, thus affirming the validity of the third clause of the will. The plaintiffs now appeal.

Some of the points involved in the case now before us were passed upon in the late case of *Gilman* v *McArdle* (99 N. Y. 451). In that case the deceased had, in her lifetime, placed in the hands of the defendant a sum of money on his promise to apply it to certain purposes during the lifetime of the deceased and of her husband, and after the death of both of them to pay their funeral expenses, etc., and to expend what should remain in procuring Roman Catholic masses to be said for the repose of their souls. This court declined to decide whether a valid trust had been created in respect to the surplus, there being no ascertained or ascertainable beneficiary who could enforce it, and the majority of the court expressly reserved its opinion upon that question, disposing of the case

upon the ground that a valid contract *inter vivos*, to be performed after the death of the promisee, had been established; that there was nothing illegal in the purpose for which the expenditure was contracted to be made, and that there was no want of definiteness in the duty assumed by the promisor; and we held that as there had been no breach of the contract, but the promisor was ready and willing to perform, he was entitled, as against the legal representatives of the promisee, to retain the consideration.

The point upon which the majority of the court, in the case last cited, reserved its decision is now again presented. There is no contract *inter vivos*, but the will expressly bequeaths the fund in question to the executors, in trust for the purposes therein specified, one of which is to apply the residuary estate to the purpose of having prayers offered in a Roman Catholic church for the repose of the souls of the testator, of his family, and of all others who may be in purgatory. It is claimed that this disposition contains all the elements of a valid trust of personal property; that there are definite and competent trustees; that the purpose of the trust is lawful, and that it is sufficiently definite to be capable of being enforced by a court of equity, as the court could decree the payment of the fund to a Roman Catholic church, or churches, for the purpose directed by the will. But if all this should be conceded there is still one important element lacking. There is no beneficiary in existence, or to come into existence, who is interested in or can demand the execution of the trust. No defined or ascertainable living person has, or ever can have, any temporal interest in its performance, nor is any incorporate church designated, so as to entitle it to claim any portion of the fund. The absence of a defined beneficiary is, as a general rule, a fatal objection to any attempt to create a valid trust. It is said by Wright, J., in *Levy* v. *Levy* (33 N. Y. 107), that "if there is a single postulate of the common law established by an unbroken line of decision, it is that a trust without a certain beneficiary, who can claim its enforcement, is void, whether good or bad, wise or unwise." It is only in regard

to the class of trusts known as " charitable " that a different rule has ever prevailed in equity in England and still prevails in some of our sister states. Whether the English doctrine of charitable uses and trusts prevails in this state will be considered hereafter. In all other cases the rule, as stated by Judge WRIGHT, is universally recognized both in law and in equity.

It is claimed that the trust now under review is not void according to the general rules of law for want of a defined beneficiary, because the trust is for the purpose of having prayers offered in a Roman Catholic church to be selected by the executors. It is contended that this is in effect a gift to such Roman Catholic church as the executors shall select, inasmuch as the money to be expended for the masses would, according to the usage, be payable to the church or churches where they were to be solemnized, and therefore as soon as the selection is made, the designated church or churches will be the beneficiary or beneficiaries, and entitled to the payment ; that the trust is, therefore, in substance, to pay the fund to such Roman Catholic church or churches, as the executors may select, and that a duly incorporated church, capable of receiving the bequest, must be deemed to have been intended. Passing the criticisms to which the assumptions contained in this proposition are subject, and considering the trust as if it had been in form to pay over the fund to such Roman Catholic church as the executors might select, to defray the expense of offering prayers for the dead, the objection of indefiniteness in the beneficiary would not be removed. The case of *Power* v. *Cassidy* (79 N. Y. 602) is relied upon by the respondents as supporting their claim. In that case the bequest was of a fund to the executors in trust, to be divided by them among such Roman Catholic charities, institutions, schools or charities in the city of New York, as a majority of the executors should decide, and in such proportions as they might think proper. The opinion of the court by MILLER, J., holds that giving full force and effect to the rule that the object of the trust must be certain and well defined ; that the beneficiaries must be either named or capable

of being ascertained within the rules of law applicable to such cases, and that the trusts must be of such a nature that a court of equity can direct their execution, and making no exception in favor of charitable uses, the bequest should be upheld as coming within the general rule; that the clause designates a certain class of objects of the testator's bounty, to which he might have made a valid, direct bequest, and that by conferring power upon his executors to designate the organizations which should be entitled to participate, and the proportion which each should take, he did not impair the legality of the provision, so long as the organizations referred to had an existence recognized by law and were capable of taking and could be ascertained; that the evidence showed that at the time of the execution of the will and of the testator's death, there were in the city of New York incorporated institutions of the class referred to in the will, and that a portion of these had been designated by a majority of the executors; that none but incorporated institutions could lawfully have been selected, and that even if the executors had failed to make a selection or apportionment, the court would have had power to decree the execution of the trust, there being no difficulty in determining what institutions came within the class described by the testator. It must be observed that in the case cited the beneficiaries were confined to Roman Catholic institutions of a certain class in the city of New York. These were necessarily limited in number. By 1 R. S. 734, section 97, it is provided that a trust power does not cease to be imperative when the grantee has the right to select any and exclude others of the persons designated as the objects of the trust. By section 99 that when the terms of the power import that the estate or fund is to be distributed between the persons designated in such manner or proportions as the trustee of the power may think proper, the trustee may allot the whole to any one or more of such persons in exclusion of the others. By section 100 that if the trustee of a power with the right of selection shall die leaving the power unexecuted, its execution shall be decreed

in equity for the benefit equally of all the persons designated as objects of the trust; and by section 101 that where a power in trust is created by will, and the testator has omitted to designate by whom the power is to be exercised, its execution shall devolve on the Court of Chancery. Regarding these provisions as declarations of general rules applicable to all trust powers and governing trusts of personal, as well as real property, the decision in *Power* v. *Cassidy* in no manner infringes upon the rule that the designation of a beneficiary entitled to enforce its execution, is essential to the validity of a trust, and the only point as to which the correctness of that decision is open to any doubt, is whether, in fact, the beneficiaries in that case were sufficiently defined and capable of ascertainment to enable a Court of Equity to enforce the trust in their behalf. The view taken in respect to that point was certainly very liberal, but the court has in subsequent cases repeatedly announced that the decision was not to be extended, and it is evident that without a material extension it cannot be made to cover the present case. Here if the church or churches from among which the selection is to be made are to be regarded as the beneficiaries, they are not limited, as in *Power* v. *Cassidy* to a Roman Catholic church or churches in the city of New York, but include all the Roman Catholic churches in the world. No one church or the churches of any particular locality can claim the benefit of the bequest. In this respect the case at bar is anlagous to that of *Prichard* v. *Thompson* (95 N. Y. 76), where the bequest was of a sum of money to the executors to be distributed by them "among such incorporated societies organized under the laws of the State of New York or the State of Maryland, having lawful authority to receive and hold funds upon permanent trusts for charitable or educational uses" as the executors or the survivors of them might select and in such sums as they might determine. This bequest was held void because of the indefiniteness of the designation of the beneficiaries. The opinion was written by the same learned judge who delivered the opinion in *Power*

v. *Cassidy*, and by him distinguished from that case on the ground that in *Power* v. *Cassidy* the class of beneficiaries was specially designated and confined to the limits of a single city and to a single religious denomination, so that each one could readily be ascertained, and each had an inherent right to apply to the court to sustain and enforce the trust, while in the case at bar every charitable and educational institution within two states was included. This case (*Prichard* v. *Thompson*) also establishes that the power to the executors to select the beneficiary or beneficiaries does not obviate the objection of the omission of the testator to designate them in the will, unless the persons or corporations from among whom the selection is to be made, are so defined and limited that a Court of Equity would have power to enforce the execution of the trust, or in default of a selection by the trustee to decree an equal distribution among all the beneficiaries.

This discussion has proceeded in answer to the claim that the church or churches where the masses were to be solemnized, were the intended objects of the testator's bounty and the beneficiaries of the trust; but the correctness of that position is by no means conceded. It is, however, not necessary to discuss it. If the bequest had been of a sum of money to an incorporated Roman Catholic church or churches duly designated by the testator and authorized by law to receive such bequests for the purpose of the solemnization of masses, a different question would arise. But such is not this case. The bequest is to the executors in trust to be by them applied for the purpose of having prayers offered in any Roman Catholic church they may select.

It has been argued that the absence of a beneficiary entitled to enforce the trust, is not fatal to its existence, where the trustee is competent and willing to execute it, and the purpose is lawful and definite ; that it is only where the trustee resists the enforcement of the trust, that the question of the existence of a beneficiary entitled to enforce it arises. I have not found any case in which this question has been adjudicated, or the point has been made and it does not seem to be

presented on this appeal. The case now before us arises on a
demurrer by the defendant Alcock, one of the executors, to
the complaint, on the ground that it shows no right in the
plaintiffs. The complaint alleges that the defendant Alcock,
together with Frederick Smyth, were named as executors in
the will; that the defendant Alcock did not qualify and has
never acted as executor or as trustee of the alleged trust
.sought to be created by the third clause, nor participated in
any form in carrying out the same, but that his co-executor
Frederick Smyth, has taken possession of the whole estate as
.such executor and trustee. Smyth is not a party .to this
appeal. It comes up on the demurrer of Alcock alone, and
there is nothing in the complaint to show that he is willing to
·execute the trust, but on the contrary it shows that he has in
no manner acted or qualified himself to act therein. But
:aside from these considerations I do not think that the valid-
ity or invalidity of the trust can depend upon the will of the
trustee. If the trust is valid he can be compelled to execute
it; if invalid he stands, as to personal property undisposed of
by the will, as trustee for the next of kin, and the equitable
interest is vested in them immediately on the death of the
testator subject only to the payment of his debts and the
·expenses of administration. When a trust is attempted to
be created without any beneficiary entitled to demand its
,enforcement, the trustee would, if the trust property were in
his possession, have the power to hold it to his own use with-
out accountability to any one and contrary to the intention of
the donor, but for the principle that in such a case a resulting
trust attaches in favor of whoever would but for the alleged
trust, be equitably entitled to the property. This equitable
title cannot on any sound principle be made to depend upon
the exercise by the trustee of an election whether he will or
will not execute the alleged trust. In such a case there is no
trust in the sense in which the term is used in jurisprudence.
There is simply an honorary and imperfect obligation to carry
out the wishes of the donor which the alleged trustee cannot
be compelled to perform and which he has no right to per-

form contrary to the wishes of those legally or equitably entitled to the property, or who have succeeded to the title. of the original donor. The existence of a valid trust capable of enforcement is consequently essential to enable one claiming to hold as trustee, to withhold the property from the legal representatives of the alleged donor. A merely nominal trust in the performance of which no ascertainable person has any interest and which is to be performed or not as the person to whom the money is given thinks fit, has never been held to be sufficient for that purpose.

It is contended, however, that charitable uses and trusts are not subject to the general rules of law upon this subject, and that the bequest now under consideration is of that class. The distinguishing features of this class of trusts as administered in England from an early period, were that they might be established through trustees, who might consist either of individuals or a corporation, and in the case of individual trustees, they might hold an indefinite succession and be self-perpetuating, and the funds might be devoted in perpetuity to the charitable purposes indicated by the donor, while private trusts were not permitted to continue longer than a life or lives in being and twenty-one years and a fraction afterwards. The persons to be benefited might consist of a class, though the individual members of the class might be uncertain. The scheme of the charity might be wanting in sufficient definiteness or details to admit of its practical administration, and in such cases a court of equity would order a reference to a master in chancery to devise a scheme for its administration which should as nearly as possible conform to the intentions of the founder of the charity, and thus was called into operation what was known as the *cy-pres* doctrine. These charitable trusts were regarded as matters of public concern, and were enforcible by the attorney-general, although in many cases the court would compel their performance without his intervention at the instance of a town or parish, or of its inhabitants, or of an individual of the class intended to be benefited, such as one of the poor, or maimed, etc. In a com-

paratively recent case argued in this court, many instances of ancient charities were cited which had been enforced by the Court of Chancery in England, such as *Cooke's charity*, decided A. D. 1552, whereby the testator ordered the purchase of lands and the erection of a free grammar school. *Bond's charity*, decided A. D. 1553, in which the testator' will, dated in 1506, directed that there should be established a Bede house at Bablock, and there should be built a chapel and therein one mass to be said on Sunday and therein to be ten poor men and a women to dress their meat and drink, the priest to be a Brother of Trinity Gild and Corpus Christi Gild, etc. *Howell's charity*, decided 1557, whereby the testator directed his executors to provide a rent of 400 ducats yearly forever, to be appropriated each year to promote the marriage of four orphan maidens, honest and of good fame. This trust appears to have been enforced in chancery upon a bill filed by certain orphan maidens in behalf of themselves and others. We were also referred to numerous other charities, for the support of the poor, for erection of alms houses, hospitals, maintaining school-masters, keeping churches in repair, and other similar purposes. In the case of *Bond's charity*, cited above, a license was granted by King Henry VII, in 1508, to the testator's son and others, to grant lands to support a priest to sing mass, and twelve poor men and one woman to say prayers and obsequies for the King, the brothers and sisters of the Gild, and for their souls, and especially for the soul of the testator, Thomas Bond, in the then newly erected chapel at Bablock. It appears that religious or pious uses were, when the Roman Catholic religion prevailed in England, recognized as charities. In 1434, Henry Barton devised to the rector of St. Mary and the church-wardens and their successors, certain lands at a perpetual rent payable to the guild of Corpus Christi, etc., so that said rector of St. Mary's and his successors, or their parish priests, when they should say prayers in the pulpit of the church, should pray for the souls of Richard Barton, the testator's father, of Dionesia, his mother, and for the souls of their children and all the faithful deceased, and in case they

should neglect to do so for two days after the proper time, that the master and wardens of said guild, etc., should levy a distress upon said lands for twelve pence by way of penalty and retain such distress until such prayers should be said. This property appears to have been afterwards seized by the crown under the statute of chauntries (1 Edw. VI), and granted by Edward VI to one Stapleton, but the rector, etc., of St. Mary's having re-entered, it was made to appear in a litigation between them and the successors in interest of Stapleton, that no prayer for souls had been made, nor had the rents of the premises been devoted to any manner of superstitious use within the space of six years and more next before the first year of the reign of King Edward VI, since which time the rents and profits had been employed by the parson and church-wardens of the parish in good uses and purposes. The case was tried in the 22d and 23d Elizabeth, and the parish was allowed to retain the land for general charitable purposes.

The purposes for which charities were established in England were so numerous and varied, and the learning contained in the books on that subject is so vast that it would be futile to attempt to go into it in detail, or to do more than briefly refer to their history so far as is necessary to determine whether the English doctrine of charitable uses and trusts, as distinguished from private trusts governed by the general rules of law, still has any place in the jurisprudence of this state. The statute of 1st Edward VI, A. D. 1547, known as the statute of chauntries, recited that a great part of superstition and errors in Christian religion had been brought into the minds of men by reason of their ignorance of their true and perfect salvation, through the death of Jesus Christ, and by devising vain opinions of purgatory, and masses to be done for those who are departed, which doctrine is maintained by nothing more than by the abuse of trentalles, chauntries and other provisions for the continuance of such blindness and ignorance; that the amendment of the same, and converting them to good and godly uses such as the erection of grammar schools, the education of youth, and better provision for the

poor cannot, in the present parliament, conveniently be done, nor be committed to any person than to the king who, by the advice of his most prudent council, can and will most wisely alter and dispose of the same. It then recites the act of 37, Henry VIII, for the dissolution of colleges, chauntries, etc., and enacts that all colleges, free chapels and chauntries not in the actual possession of the late or present king (with certain specified exceptions), and all their lands and revenues are declared to be in the actual seizin and possession of the present king, without office found, and that all sums of money, etc. which, by any conveyance, will, devise, etc., have been given or appointed in perpetuity towards the maintenance of priests, anniversaries or obits, be vested in the king. Certain colleges, free chapels and chauntries, such as those within the universities of Oxford and Cambridge, and others specified in the statute, were exempted from its provisions, but the king was empowered to alter the chauntries in the universities. In this manner property which had been devoted by the donor to uses which had come to be regarded as superstitious, were, through the king, put to charitable uses which were deemed lawful and this policy was carried out by many decrees of the Court of Chancery. The statute of 39 Elizabeth, A. D. 1597, authorized persons owning estates in fee simple during twenty years next ensuing the passage of the act, by deed enrolled in the high Court of Chancery, to found hospitals, houses of correction, alms-houses, etc., to have continuance forever and place therein a head and members and such number of poor as they pleased; and such institutions were declared to be corporations, with perpetual succession. It will be observed that this was but a temporary act which gave power only for twenty years next ensuing its passage to found the chauntries mentioned. This statute also contained a provision, entitled " An act to reform deceits and breaches of trust touching lands given to charitable uses," which recited that divers institutions had been founded, some by the queen and her progenitors, and some by other godly and well disposed people for the charitable relief of poor, aged and impotent people, maimed soldiers, schools of learn-

ing, orphans, and for other good, charitable and lawful purposes and intents, and that lands and goods given for such purposes had been unlawfully converted to the lucre and gain of some few greedy and covetous persons; and then proceeds to provide for the issue of commissions out of chancery to inquire into those wrongs, and decree the observance of the trusts according to the intent of the founders thereof. This statute was followed by that of 43 Elizabeth, chapter 4, "To redress the misemployment of lands, goods, and stocks of money heretofore given to charitable uses." This act is known as the statute of charitable uses and was at one time, together with that of 39 Elizabeth, regarded as the foundation of the law of charitable uses and of the jurisdiction of chancery in cases of charities. But the reports of the record commission, established in 1819, have disclosed that the jurisdiction had been exercised and charity laws administered by the courts of chancery from a much earlier period. The act, however, throws light upon what were at the time considered and recognized as charitable uses, for they are enumerated in the preamble as follows, viz.: the relief of the poor, the maintenance of sick and maimed soldiers and mariners, schools of learning, free schools, and schools in universities, the repairs of bridges, ports, havens, causeways, churches, sea-banks and highways, the education and preferment of orphans. The maintenance of houses of correction, the marriage of poor maidens, the aid of young tradesmen, handicrafts men and persons decoyed, the relief or redemption of prisoners or captives, the aid of poor persons in the payment of taxes. The act then provides for the issuing of commissions by the lord chancellor of England or the chancellor of the Duchy of Lancaster, and the redress of breaches of trust, as in the statute 39 Elizabeth.

In this enumeration of charitable uses there is none which would cover the present case; and, indeed, under the statute of chauntries and other statutes prohibiting superstitious uses, it would not have been recognized in England as valid as a charity or otherwise. But assuming, as perhaps we ought to

assume, that before gifts for the support of priests, chauntries, etc., came to be regarded as superstitious uses, they were within the principles of charity, and that they became illegal only by virtue of the statutes against superstitious uses, in this state, where all religious beliefs, doctrines and forms of worship are free, so long as the public peace is not disturbed, the trust in question cannot be impeached on the ground that the use to which the fund was attempted to be devoted was a superstitious use.  The efficacy of prayers for the dead is one of the doctrines of the Roman Catholic church, of which the testator was a member; and those professing that belief are entitled in law to the same respect and protection in their religious observances thereof as those of any other denomination. These observances cannot be condemned by any court, as matter of law, as superstitious, and the English statutes against superstitious uses can have no effect here.  (Const. U. S. amendment, art. 1; Const. of N. Y., art. 1, § 3.)

If in other respects the bequest was, by the law of England, valid as a " charitable " use, and the English doctrine of charitable uses prevails in this state, the objections to its validity on the ground of indefiniteness of the trust, perpetuity and the absence of an ascertainable beneficiary, can be overcome. Otherwise they must prevail, at least so far as relates to the absence of a beneficiary, which is sufficient to dispose of the case without reference to the other points.  We will, therefore, treat the bequest as a charitable use.

The principal cases in this state in which the doctrine of charitable uses has been discussed are: *Williams* v. *Williams* (8 N. Y. 527); *Owens* v. *Missionary Society* (14 id. 380); *Beekman* v. *Bonsor* (23 id. 298); *Downing* v. *Marshall* (23 id. 366); *Levy* v. *Levy* (33 id. 97); *Rose* v. *Rose Beneficent Association* (4 Abb. Ct. App. Dec. 108); *Bascom* v. *Albertson* (34 N. Y. 584); *Burrill* v. *Boardman* (43 id. 254).

These cases were argued by counsel of eminent ability, and in the arguments and opinions display a depth of learning and thoroughness of research which render it useless to

attempt a discussion of the question here as an original ques-
tion, or to do more than summarize the main points upon
which the arguments turned, and ascertain how the case
stands upon those authorities. So lately, as the case of *Bur-
rill* v. *Boardman* (43 N. Y. 254), the question was argued as
still an open one, and that case was decided on the ground
that the trust was valid without resorting to the doctrine of
charitable uses. COMSTOCK, J., in a note to the 11th edition
of Kent's Commentaries (vol. 4, p. 305, note 2), states that
the essential requisites of a valid trust are (1), a sufficient
expression of an intention to create a trust; (2), a beneficiary
who is ascertained or capable of being ascertained; that the
appointment or non-appointment of a trustee of the legal estate
is not material; that if the trust or beneficial purpose be well
declared, and if the beneficiary is a definite person or corpora-
tion capable of taking, the law itself will fasten the trust upon
him who has the legal estate, whether the grantor, testator,
heir or next of kin, as the case may be, and that outside of the
domain of *charitable uses* no definiteness of purpose will sus-
tain a trust if there be no ascertained beneficiary who has a
right to enforce it. And in delivering the opinion of this
court, in *Beekman* v. *Bonsor* (23 N. Y. 310), the same learned
judge says that the joint authority of the cases of *Williams*
v. *Williams* (8 N. Y. 525) and *Owens* v. *Missionary Society*
(14 id. 380) establishes the propositions (1) that a gift to charity
is maintainable in this state if made to a competent trustee, and
if so defined that it can be executed, as made by the donor, by
a judicial decree, although it may be void, according to general
rules of law, for want of an ascertained beneficiary; (2) that,
in other respects, the rules of law applicable to charitable uses
are within those which appertain to trusts in general; (3) that
the *cy-pres* power which constitutes the peculiar feature of the
English system, and is exercised in determining gifts to charity
where the donor has failed to define them, and in framing
schemes of approximation near to or from the donor's true
design, is unsuited to our institutions and has no existence in
the jurisprudence of this state on this subject; but he declined

to re-examine these cases, as he concludes that the law of charities could not be invoked in the case then under consideration. The same learned judge, however, in the subsequent case of *Bascom* v. *Albertson* (34 N. Y. 584), in which he acted as counsel, reviewed at length the question whether the English law of charitable uses prevailed to any extent whatever in this state.   His argument was preserved in print and was used in *Burrill* v. *Boardman* (43 N. Y. 254); and in that argument, referring to what he had said, in his opinion in *Beekman* v. *Bonsor*, as to the proposition that a gift to charities, if well defined and made to a competent trustee, was maintainable in this state, although it might be void, according to general rules of law, for want of an ascertained beneficiary; and to the similar remark, in his opinion in *Downing* v. *Marshall* (23 N. Y. 382), characterizes his own remarks in those two cases as a most inconsiderate repetition, as a *dictum* of a proposition laid down by another judge, calling attention to the fact that the repetition was a mere *dictum*, because in the two cases in which it was made the trusts were held void.

The case of *Williams* v. *Williams* (8 N. Y. 525) is the leading case in the court of last resort of this state in support of the doctrine that the English law of charitable uses is in force in this state, and it fully supports the proposition that it is.   In that case the testator after making a bequest to an incorporated church bequeathed the sum of $6,000 to Zophar B. Oakley and other individual trustees, with power to perpetuate their successors, as a perpetual fund for the education of the children of the poor who should be educated in the academy of the village of Huntington, with directions to accumulate the fund up to a certain point and apply the income in perpetuity to the education of the children whose parents' names were not upon the tax lists.   The opinion was delivered by DENIO, J., and concurred in by four of the other judges, three judges dissenting.   The opinion held that this bequest, by the general rules of law, would be defective and void as a conveyance in trust for the want of a *cestui que trust* in whom the equitable title could vest, and could be sustained only by

force of that peculiar system of law known in England under the name of the law of charitable uses; that the objection that .the bequest assumed to create a perpetuity would also be fatal if the Revised Statutes applied to gifts for charitable purposes. But the learned judge held, that according to the laws of England as understood at the time of the American Revolution .and as it still existed, devises and bequests for the support of charity or religion, though defective for want of such a grantee or donee as the rules of law required in other cases, would, when not within the purview of the mortmain act, be supported in the Court of Chancery; that the law of charitable uses did not originate in and was not created by the statute (43 Eliz. C 4), but had been known and recognized and enforced before that statute, and was engrafted upon the common law and consequently was not abrogated by the repeal in this state of the statute 43 Elizabeth in 1788 (Laws of 1788, chap. 46, § 37); that the provisions of the Revised Statutes did not affect property given in perpetuity for religious or charitable purposes, and that consequently the bequest to Zophar B. Oakley and others in trust for the children of the poor was valid. In *Owens* v. *Missionary Society* (14 N. Y. 380) the testator bequeathed the residue of his estate to the "Methodist General Missionary Society," an unincorporated association existing when the will was made and when it took effect in 1834, but which subsequent to the testator's death became incorporated.   In a suit between the incorporated society and the next of kin of the testator, the bequest was held void, and that the next of kin were entitled to the residue.   Opinions were delivered by SELDEN, J., and DENIO, J., and Judges A. S. JOHNSON, T. A. JOHNSON, HUBBARD and WRIGHT, concurred in the opinion of SELDEN, J., which held that the bequest was not valid as one made to the association for its own benefit, because of its incapacity to take, nor could it be sustained as a charitable or religious use, as it was not accompanied by any trust as to the application of the fund.   Also, that where there was no trustee competent to take, our court of chancery had no jurisdiction to uphold a trust for a charitable or

religious purpose, and it distinguished the case from *Williams*
v. *Williams*, on the ground that there the bequest was to
trustees competent to take.   Although the tenor of the opinion
is against following the example of the English chancellors in
applying a peculiar and partial system of rules to the support
of charitable gifts, Judge SELDEN disavows the intention of
denying the power of courts of equity in this state to enforce
the execution of trusts created for public and charitable pur-
poses in cases where the fund is given to a trustee competent
to take, and where the charitable use is so far defined as to be
capable of being specifically executed by the authority of the
court, even although no certain beneficiary, other than the
public at large, may be designated.   DENIO, J., while reaffirm-
ing the decision in *Williams* v. *Williams*, placed his vote
upon the ground that the trust was not one which could be
executed by the court as a charitable use, the purposes of the
society being " to diffuse more generally the blessings of educa-
tion, civilization and christianity throughout the United States
and elsewhere ; " that although trusts in favor of education
and religion had always been considered charitable uses, and
were recognized as such in the statute of Elizabeth, the
advancement of civilization generally was not classed among
charities, and the whole fund might be disposed of for pur-
poses promotive of universal civilization, which still would
not be charitable objects in the understanding of the law.
Six of the judges were of opinion that the charity was not suffi-
ciently defined by the terms of the will, and that the judgment
in favor of the next of kin should be affirmed on that ground.
The next case in order is *Beekman* v. *Bonsor* (23 N. Y. 298).
In that case the amount to be given to the charitable purpose,
as well as the manner in which the fund was to be applied,
was left to the discretion of the executors.   They renounced,
and it was held that the trust was incapable of execution ;
that the *cy-pres* power, as exercised in England in cases of
charity, had no existence in this state ; and that the next of
kin were entitled to the fund.   Numerous points were dis-
cussed in the opinion, which was by COMSTOCK, J. ; and he

there made the *dictum*, which he afterwards recalled, that a gift to charity which would be void by the general rules of law for the want of an ascertained beneficiary would be upheld by the courts of this state if the thing given was certain, if there was a competent trustee to administer the fund as directed, and if the charity itself was precise and definite. *Downing* v. *Marshall* (23 N. Y. 366) held that a devise and bequest to an unincorporated missionary society were void on the same grounds as in the case of *Owens* v. *Missionary Society*. Up to this time the doctrine of the case of *Williams* v. *Williams*, as to the validity of trusts for charities, even in the absence of a definite beneficiary, had been acquiesced in. But in *Levy* v. *Levy* (33 N. Y. 97), it was vigorously assailed by WRIGHT, J., who discussed the question anew whether the English doctrines of trusts for charitable uses were law in this state. That learned judge expressed a decided opinion that they were not (p. 105 *et seq.*); that that peculiar system of jurisprudence proceeded in disregard of rules deemed elementary and fundamental in other limitations of property, in upholding indefinite charitable gifts, by the exercise of chancery powers and the royal prerogative; that it was not the exercise of the ordinary jurisdiction of chancery over trusts, but a jurisdiction extended and strengthened by the prerogative of the crown, and the statute of 43 Elizabeth, over public and indefinite uses, defined in that statute as charities; that even in England it had been deemed necessary to restrain and regulate by act of parliament the creation of these indefinite charitable trusts by the statute of mortmain and other restrictions; and it cannot be supposed that the system was deliberately retained in this state, freed from all legislative restriction. He calls attention to the fact that in 1788 the legislature of this state repealed the statute of 43 Elizabeth, the statute against superstitious uses, and the mortmain acts; that at that time it was supposed that the law for the enforcement of charitable trusts had its origin only in the statute of Elizabeth, and argues that the legislature of 1788 in thus sweeping away

:all the great and distinctive landmarks of the English system, must have intended that the effect of the repeal should be to abrogate the entire system of indefinite trusts which were understood to be supported by that statute alone, and that the whole course of legislation in this state indicates a policy not to introduce any system of public charities except through the medium of corporate bodies; that in 1784 the general law for the incorporation of religious societies had been enacted, and that before and contemporaneously with the repeal of the statute of Elizabeth and the statute of mortmain, special acts incorporating such societies were passed and other acts have been passed creating or authorizing corporations for various religious and charitable purposes, in all of which are to be found limitations upon the amount of property to be held by such societies, thus indicating a policy to confine within certain limits the accumulation of property perpetually appropriated, even to charitable and religious objects; that the absolute repeal of the statute of Elizabeth and of the mortmain acts was wholly inconsistent with the policy thus indicated, unless it was intended to abrogate the whole law of charitable uses as understood and enforced in England. The opinion then refers to the course of legislation in this state following the repeal of the English statutes authorizing corporations for charitable, religious, literary, scientific and benevolent purposes, and in all cases limiting the amount of property to be enjoyed by them. This legislation is claimed to disclose a policy differing from the British system and absolutely inconsistent with the supposition that uses for public or indefinite objects and of unlimited duration can be created and sustained without legislative sanction.

Since the case of *Williams* v. *Williams,* decided thirty-five years ago, there has been no adjudged case in this court which supports a charitable gift on the principles enunciated by Judge DENIO in pronouncing that decision. Of course this observation applies only to the indefinite charity which the case included and not to the gift in favor of a religious corporation. After the decision of that case the struggle in this

court for the overthrow of charitable uses began in the case of
*Owens* v. *Missionary Society* (14 N. Y. 380). The opponents
of such trusts had for their justification the repeal in 1788 in
this state of all the British statutes which upheld such trusts
in England, and the substitution of a charity system main-
tained by our statute laws in the form of corporate charters,
containing, by legislative enactment, power to receive, hold
and administer charitable gifts of every variety known in the
practice of civilized communities and our statute of uses and
trusts, defining the trusts which may lawfully be created.
This statute has been held binding on the courts, although of
course it ceases to operate when the legislature charters a cor-
poration for a charitable purpose with power to take and hold
property in perpetuity for such purpose. From the case of
*Owens* v. *Missionary Society* (14 N. Y. 380) through the
cases of *Downing* v. *Marshall* (23 id. 366), *Levy* v. *Levy*
(33 id. 97), *Bascom* v. *Albertson* (34 id. 584), *Burrill* v.
*Boardman* (43 id. 254), and *Holmes* v. *Mead*, decided in
1873 (52 id. 332), the struggle was continued and the announce-
ment definitely made, in the latest of those cases, that the
controversy was closed by the adoption of the principles
enunciated in the said last mentioned case. In *Williams* v.
*Williams*, Judge DENIO, whose great learning and ability are
universally acknowledged, maintained as the basis of his conclu-
sion in favor of charitable trusts as the law of this state, that they
came to us by inheritance from our British ancestors, and as
part of our common law. That particular postulate being
finally overthrown and the British statutes having been
repealed at the very origin of our state government, we
should be a civilized state without provision for charity if
we had not enacted other laws for ourselves. But charity, as
a great interest of civilization and christianity, has suffered
no loss or diminution in the change which has been made.
The law has been simplified and that is all. Instead of the
huge and complex system of England, for many generations
the fruitful source of litigation, we have substituted a policy
which offers the widest field for enlightened benevolence,

The proof of this is in the great number of charitable institutions scattered throughout the state.   It is not certain that any political state or society in the world offers a better system of law for the encouragement of property limitations in favor of religion and learning, for the relief of the poor, the care of the insane, of the sick and the maimed, and the relief of the destitute, than our. system of creating organized bodies by the legislative power and endowing them with the legal capacity to hold property which a private person or a private corporation has to receive and hold transfers of property. Under this system many doubtful and obscure questions disappear and give place to the more simple inquiry whether the grantor or devisor of a fund designed for charity is competent to give; and whether the organized body is endowed by law with capacity to receive and to hold and administer the gift. In *Williams* v. *Williams* (*supra*), in maintaining a gift for pious uses to an incorporated religious society, Judge DENIO assigned the reasons which have been universally approved since that time ; and they are summed up by saying, that charitable limitations of property, in favor of corporations competent by statute law to hold them, are valid or invalid on the same grounds as other limitations of property between natural persons, and are referable to the general system of law which governs in the ordinary transactions of mankind.   From his reasoning in the other branch of the case before him, it appears that he had not reached the conclusion established in the later cases, namely, that with us charity is found in our corporation laws, general and special, which have been extended so as to embrace the purposes heretofore known and recognized as charitable, and which are continually extending and improving so as to meet the new wants which society in its progress may develop.

As the result of the foregoing views the judgment of the Supreme Court at General Term should be reversed, and that of the Special Term affirmed.

All concur, except EARL, J., not voting.

Judgment accordingly.