### ABBIE HARRISON v. THOMAS BROPHY et al.

#### No. 8526.

1. WILL—*bequest in, for celebration of mass, held a direct gift to priest, and not a trust void for want of a beneficiary in being.* A bequest of a sum of money made in the will of a member of the Roman Catholic Church to a priest of such church, for the celebration of mass for the souls of the testator and another, will be construed as a gift direct to the donee, with an injunction to the performance of the ceremonial named, and not as made to him in trust for such purpose and, therefore, void because incapable of enforcement by beneficiaries in being.

2. ——— *English common law avoiding such bequests never part of the common law of this country.* The English common law which avoided bequests of the kind above stated as being for superstitious uses, never became a part of the law of this country; and the validity of the gift for the purpose named is, therefore, upheld.

Error from Franklin District Court. A. W. Benson, Judge. Opinion filed January 8, 1898. *Affirmed.*

1—59 KAN.

*J. W. Deford*, for plaintiff in error.

*Wm. H. Clark*, for defendant in error.

DOSTER, C. J. : Mary Brophy, a widow lady, was a member of the Roman Catholic Church and a believer in its faith and doctrines. She was possessed of an estate consisting of personal property alone. She died, after having executed a will in which specific legacies in money were given to her children and grandchildren. A residuary sum was bequeathed in the following language : "I give and bequeath to Rev. James Collins, for mass for his grandfather's and grandmother's soul." The legatee named was a priest of the Roman Catholic Church, and was the grandson of the testatrix and her deceased husband. The validity of the legacy made to him is denied by the heirs of Mary Brophy. The District Court sustained the bequest, and error is now prosecuted from its decision.

The claims of error are, that the will undertakes to create a trust, the beneficiaries of which are disembodied spirits, in whose favor no trust can exist; that the trust, if otherwise valid, is void for uncertainty in the *cestuis qui trustent*, and that the gift is void because repugnant to the ancient common law against bequests for "superstitious uses." Of these in their order.

The will does not undertake to create a trust. The gift is absolute to the person named. The language in which it is made is advisory, persuasive, expressive of desire, "precatory," as called in the law of wills, but the passing of the gift is not conditioned upon the performance of the act enjoined. Upon the conscience of the donee alone is laid the duty of performing the sacred service named. The testatrix might have made the gift in the usual

1. Bequest held direct gift.

terms. That she coupled with it an injunction to the performance of a solemn religious ceremonial cannot avoid it. The case of *Holland v. Alcock*, 108 N. Y. 312, is not in point against this view. The bequest in that case was made to the trustees *eo nomine*. It was not made direct as in this case. There can be, of course, no trustee without a beneficiary in being, and inasmuch as in the case named there was no beneficiary there could be no trustee, and consequently no trust. Moreover, the case recognized the distinction we draw. The court in its opinion, on page 322, says :

"If the bequest had been a sum of money to an incorporated Roman Catholic church or churches, duly designated by the testator, and authorized by law to receive such bequests for the purpose of solemnization of masses, a different question would arise. But such is not the case."

Since the decision of that case, the subordinate courts of New York have upheld bequests of the character of the one in question. *In Re Howard's Estate*, 25 N. Y. Suppl. 1111 ; *Vanderveer v. McKane*, 25 Abb. New Cases, 105. The fact that the legacy was a gift direct, and was not bequeathed in trust, obviates the necessity of noticing the objection, made by counsel for plaintiff in error, that it is void for uncertainty as to the beneficiaries.

Neither is the gift void because repugnant to the law against bequests for "superstitious uses." To properly interpret the part of the will in question, and to determine whether effect can be given to it, we must bear in mind the Catholic Church doctrine of Purgatory. Purgatory is defined by an authorative expositor of the Church's creed to be "a state of suffering after this life, in which those souls are *for a time detained* who depart this life after their deadly sins have been remitted as to the *stain and guilt*, and as to the *everlasting pain* that was due to them ; but

who have on account of those sins still some debt of *temporal* punishment to pay; as also those souls which leave this world guilty only of *venial* sins. In Purgatory these souls are purified and rendered fit to enter into Heaven, where nothing defiled enters." Catholic Belief, Lambert's Amer. Ed., 196. Devotees of this church "also believe that the souls in Purgatory . . . are relieved by the sacrifice of the Mass, by prayer, and pious works, and almsdeeds." Id. 202. Scriptural authority, as it is recognized by Catholics, though by others regarded as apocryphal, exists for the practice of offering prayers for the dead, and for contributions to the church to enable it to perform its offices in their behalf.

"And when he had made a gathering throughout the company to the sum of two thousand drachms of silver, he (Judas Maccabeus) sent it to Jerusalem to offer a sin offering, doing therein very well and honestly, in that he was mindful of the resurrection; for if he had not hoped that they that were slain should have risen again, it would have been superfluous and vain to pray for the dead. And also in that he perceived that there was great favor laid up for those that died godly. (It was an holy and great thought.) Whereupon he made a reconciliation for the dead, that they might be delivered from sin." 2 Maccabees, ch. 12, verses 43, 44, 45.

In the light of these beliefs, the act of Mary Brophy in making the bequest is reasonable and consistent, and should be upheld unless it be prohibited by force of some positive rule of law. In the reigns of Henry VIII and Edward VI statutes were enacted to prevent the devoting of property to what was termed "superstitious uses." This was anterior to the reign of James I, during which the common law, consisting of the statutes and legal customs and usages then in force was imported into the colonies; and, therefore, unless

2. English common law does not apply.

these statutes have been abrogated or modified by constitutional or statutory law, judicial decisions, or the condition and wants of the people, they are of binding force in this State. Gen. Stat. 1897, ch. 1, § 4. If by proper construction the statutes of Henry VIII and of Edward VI prohibit the making of bequests for the purposes named in the will under consideration, assuming them to be parts of our law, the gift in question must fail. It is said, however, that the English courts did not hold the making of such gifts to be repugnant to the terms of these statutes, but declared them void by analogy to the prohibitions of the statutes and by the general policy of the common law. Jarman on Wills (6th ed.), vol. 1, 197–8. Be that as it may, and for the purpose of the question before us it can make no difference whether the prohibition was originally statutory or otherwise, we have no hesitation in declaring the English common law interdiction of bequests of the kind named to be without force in this state. It is opposed to the spirit of religious toleration which has always prevailed in this country, and which has found expression in the Federal Constitution and statutes and in the Constitution and statutes of every state of the Union. That religious intolerance which infused itself through parliamentary enactments and judicial sentences, and which procured the law to anathematize differing creeds as "superstition" or "heresy" according as Catholic or Protestant gained governmental ascendancy, was, more than anything else, what our ancestors fled from. It would be strange indeed had they carried to this country and established here the very laws of religious persecution from which they sought to escape. They brought here such of the common law as was adapted to the condition and wants of the people and as was

consistent with the spirit and genius of free political and religious institutions. Sparks' Franklin, vol. 4, 271. What was not thus brought has since been made ; and every addition to the ancient fabric which bears any relation to the subject of religious right has been a cumulative guaranty of religious freedom. It is not, however, meant that religious toleration, as it now exists, was from the beginning the rule of practice in the colonies. What is meant is, that the disabilities of the English law upon the rights of conscience and freedom of worship, though imposed in many instances, did not become established as a part of our legal polity. The fierce struggle between ancient bigotry and growing liberality, though renewed and continued here, was not a struggle between an established order and a revolutionary and protesting force. It was a struggle to prevent, and not to uproot, a legally authorized ecclesiastical system. In the sense, therefore, that the efforts of many of the colonists to prescribe articles of faith and forms of worship, though partially and temporarily successful in parts of the country, finally and wholly failed, it may be said that the penalties of the English statutes and courts upon non-conformity of religious belief and practice never became incorporated into the common law of this country. The express provisions of our constitutional guaranties are to the contrary.

"Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." Amendment to the Constitution of the United States, Art. 1.

"The right to worship God according to the dictates of conscience shall never be infringed ; nor shall any person be compelled to attend or support any form of worship ; nor shall any control of, or interference with the rights of conscience be permitted ; nor any preference be given by law to any religious establishment, or mode of worship. No religious test or property

qualification shall be required for any office of public trust, nor for any vote at any election, nor shall any person be incompetent to testify on account of religious belief." Constitution of Kansas, Bill of Rights, § 7.

Many other provisions illustrative of the degree of religious toleration allowed to the people of this country might be quoted. The bequest of Mary Brophy is valid by the letter of many of them, and by the spirit of all. We may question the soundness of her belief, and may deride the claim of efficacy of the service she desired to have performed, but the law has no care for contrariety of faith as to spiritual things, and will, therefore, sanction the bequest she has made. The law interferes with no mere religious opinions, nor with religious practices, except such as tend to subvert the foundation of public morals and order. *Reynolds v. United States*, 98 U. S. 145.

The judgment of the court below is affirmed.

Johnston, J., concurring with the result.